886 So.2d 127 (2003)
William John ZIEGLER, alias Greg John Lilly
v.
STATE of Alabama.
CR-00-1987.
Court of Criminal Appeals of Alabama.
February 28, 2003.
Opinion Affirming as to Sentence on Return to Remand June 27, 2003.
Rehearing Denied October 24, 2003.
Certiorari Denied February 20, 2004.
*129 Arthur J. Madden III, Mobile, for appellant.
William H. Pryor, Jr., atty. gen., and Regina F. Speagle, asst. atty. gen., for appellee.
Alabama Supreme Court 1030216.
COBB, Judge.
William John Ziegler, alias Greg John Lilly, was indicted pursuant to § 13A-5-40(a)(1), Ala.Code 1975, for the murder of Russell Allen Baker, made capital because it was committed during the course of a *130 kidnapping. After a jury trial, Ziegler was convicted of capital murder. After a sentencing hearing, the jury recommended, by a vote of 11-1, that Ziegler be sentenced to death. The parties presented additional arguments at the sentencing hearing held before the trial court and the trial court then ordered that Ziegler be sentenced to death. Ziegler filed a motion for a new trial, which the trial court denied. This appeal followed.
Nineteen-year-old Allen Baker was beaten and stabbed to death on February 19, 2000. On the night before he was murdered, Vickie Bosarge, whose sons were friends of Baker's, heard William Ziegler say to Baker that he had caught Baker "slipping"; he also told Baker that he was "a walking dead man." (R. 206.)
Allen Baker's body was recovered on the night of February 23, 2000, in a wooded area near a road. Dr. Leroy Riddick performed an autopsy on Baker the following day. He testified that Baker was five feet, nine and one-half inches tall, and that he weighed 137 pounds. Dr. Riddick described Baker's injuries as follows:
"His whole forehead from all the way across was red with a big bruise and had multiple scrapes in it. ... This is a laceration.... It's a couple of inches long and gaping.
"He had black eyes, and he has  this is about five and [one-]half inches across in size. It's a cut that goes down to his maxillary bone. The white stuff that you see in there are maggot eggs or maggots. And it goes across his nose to the right side, and there are bruises on that side.
"And then you can see there's another large size wound here on his  this portion looks like a stab wound there and another large [incised] wound on his neck there. There's a stab wound here, and there's another bruise right there on his lip."
(R. 448-49.)
Dr. Riddick further testified that Baker suffered multiple stab wounds to the back of his head and to his neck and back. One of the stab wounds to the head, Dr. Riddick stated, "goes all the way through the bone into the back of the skull." (R. 449.) One of the neck wounds was over seven inches long. Dr. Riddick testified that the neck wound "goes through all the muscles on his neck and it goes through his larynx or his trachea, his windpipe, all the way down  all the way through so it's totally transected." (R. 451.) That wound severed the carotid artery on the right side of Baker's neck, and both of his jugular veins. Baker sustained 14 stab wounds to his chest and abdomen; some of the stab wounds damaged his lungs, stomach, and liver. Dr. Riddick was unable to discern whether the knife or knives that caused the injuries had serrated blades. The doctor discovered several wounds on Baker's hands and on the backs of his arms. He classified those wounds as "defensive-type injuries where he was trying to ward off somebody hitting or whatever else...." (R. 454.) On Baker's left arm, from his shoulder to his elbow, Dr. Riddick observed 11 distinct blunt-force injuries. Those injuries were consistent with the dimensions of a golf club provided to Dr. Riddick for comparison purposes. Dr. Riddick testified that Baker sustained at least 103 sharp force injuries, or knife wounds, and at least 27 blunt-force injuries such as contusions, abrasions, and lacerations. (R. 456-57.) Baker "died of multiple blunt force injuries and sharp force injuries." (R. 459.) No drugs or alcohol were found in Baker's system.
The testimony at trial indicated that during the late afternoon hours of February 19, 2000, Baker, William Randall, Jay *131 Bennett, and two teenage girls went to an apartment at the Peach Place Inn apartments occupied by William Ziegler and his girlfriend, Patricia Davis, and Davis's four-year-old child. The apartment was located approximately two tenths of a mile from the wooded area where Baker was later killed. Trial testimony indicated that the group drank beer and talked for a while, then the women went to a convenience store. While they were gone, the men began to argue and fight.
At approximately 11:30 p.m., the security officer at the Peach Place Inn testified that he received a complaint regarding loud music in the unit Ziegler occupied. He spoke with someone in the apartment, and that person lowered the volume of the music. The security officer testified that, a few days later, Ziegler asked him if he had seen anyone walking down the road by the Peach Place Inn on February 19. The security officer told Ziegler that he had seen no one.
Sarah Meyers, one of the teenage girls, testified that she knew Will Randall and Dawn Kohn, the other teenage girl, from school, and that she was with them in Ziegler's apartment on February 19, 2000. Meyers testified that she, Dawn Kohn, the other teenager, and Patricia Davis went to a nearby convenience store, and when they returned, the men would not allow them to enter the apartment. The women went back to the convenience store, and when they returned to the apartment, only Davis was permitted inside. Meyers said that, while she sat outside the apartment for 20 to 30 minutes, she heard "banging and hollering" inside the apartment. (R. 235.) Will Randall eventually let Meyers and Kohn inside the apartment, and they sat in the living room. Meyers observed blood on the living room chair, walls, and lamp. She also saw Ziegler and Bennett walk Baker into the bedroom.
Meyers then heard screaming and banging from the bedroom, and the noises grew louder. Meyers said that Baker was the person screaming. (R. 280-81.) Ziegler, Randall, and Bennett then walked Baker from the bedroom into the bathroom. They "huddled around" Baker as they led him into the bathroom. (R. 240-41.) Randall came out of the bathroom, and Meyers asked him why they were beating Baker. Randall told her that Baker had raped Jay Bennett's mother and his ex-wife. Meyers walked near the bathroom and saw Ziegler and Randall in the doorway, and she saw Bennett hitting Baker with what appeared to be a belt. Baker was in the bathtub while he was being beaten.
Meyers testified that she asked the men if she could use the bathroom, and the three men escorted Baker from the bathroom into the bedroom. When she finished using the bathroom, the three men returned Baker to the bathroom. Meyers asked Randall if she could go into the bathroom to see Baker. Randall asked Meyers if she could promise that she was "not gonna freak out." (R. 247.) When she walked into the bathroom, Baker was sitting alone. Meyers described his appearance:
"His eyes were swollen, his nose broke and swollen  out to here and it was blue. His lip was swollen. He had  His head was swollen all around and he had gashes in his head and he had slits up his arm and he had gashes in his finger."
(R. 248.)
Meyers said she "freaked out" when she saw Baker. (R. 248.) She helped Baker put on his shirt and his shoes. Bennett told Meyers to leave the bathroom so that he and Ziegler could talk to Allen, which they did. Bennett talked to Patricia Davis, and Davis then told Meyers and *132 Kohn that the three of them were going into the bedroom to wait, because the men were going to walk out. As she stood in the doorway, Meyers saw Ziegler, Randall, and Bennett walk Baker outside the apartment. She testified that she, Kohn, Davis, and the 4-year-old boy waited in the bedroom for 20 or 30 minutes, then they waited in the living room. Ziegler, Randall, and Bennett returned to the apartment and sat in the living room, Meyers said. Ziegler then disposed of what Meyers believed to be a towel that Baker had used to wrap around his head after he was beaten. Meyers testified that she asked Randall what had taken them so long, and Randall told her that they had walked him down the street to a stop sign, and let him walk from there.
Meyers said that the group then sat at the kitchen table, and Ziegler and Bennett pulled out their knives and "played" with them. (R. 256.) The knives had black handles and the tips of the blades were serrated. (R. 274-75.) Meyers acknowledged that she asked Ziegler to scratch her arm with his knife, which he did. Meyers said that Bennett took her, Kohn, and Randall home at approximately 1:00 a.m.
Meyers returned to the apartment the next day to retrieve her hat. Ziegler, Davis, and Randall were in the apartment, and she asked Randall how Baker was doing. Randall told her that Baker was fine, and that Baker and Bennett were friends again.
On cross-examination, Meyers testified that she never saw Ziegler hit Allen. (R. 264.) Meyers said that Randall told her that he had punched Allen and had broken his nose. She also stated that Will Randall threatened her not to tell about the events of February 19. Ziegler did not threaten her, she said.
Ashley Massengale testified that, on February 19, 2000, she was living in an apartment at Peach Place Inn located on the first floor, beneath the apartment Ziegler occupied. Late that evening, she heard banging noises from Ziegler's apartment, so she knocked on the door of the apartment. Ziegler answered the door, apologized for the noise, and said they had just been having fun and were wrestling with the four-year-old. Massengale described Ziegler as appearing "sweaty and huffy and puffy." (R. 287.) When she returned to her apartment, Massengale said, the noise continued. She said it sounded like two men were wrestling on the floor, going back and forth.
Massengale left her apartment again to go upstairs and she saw Patricia Davis and two young women getting out of a car. She asked Davis to tell the people in her apartment to be quiet, and Davis started to cry. Davis went upstairs and the two young women went to a public telephone nearby. Massengale said that the fighting upstairs did not stop, so she went upstairs a second time. Ziegler again answered the door, and he apologized for the noise and said they would be quiet. The fighting and the noise continued, so Massengale went to the office to talk to the security guard. She and the guard went to Ziegler's apartment, and the guard spoke to Ziegler. Massengale said that the noise continued even after she returned to her apartment that time. She testified that the last place she heard the noise was above her bathroom ceiling. She said it sounded like her ceiling was going to fall in, but she did not go back to Ziegler's apartment.
Dawn Kohn testified that she was a high school student, and that she had been dating Will Randall for a few weeks before the night Allen Baker was killed. She said that she did not know William Ziegler, Jay Bennett, or Patricia Davis, and that she met them on the night of February 19, *133 2000. She said that, on the evening of the murder, Bennett, Randall, and Ziegler picked her up, then picked up her friend, Sarah Meyers, and drove them to Ziegler's apartment. Kohn said that the men appeared to be good friends and that they laughed and joked during the ride. Kohn said that, at Ziegler's apartment, everyone watched television and drank beer for a while, then the three women went to the store. Kohn said that when they returned to the apartment, they knocked on the door and could hear wrestling in the house. Randall came to the door and let Davis inside. He told Meyers and Kohn that a fight was going on, that they were handling it, and that the two of them should stay outside. Meyers knocked on the door a few times, asking Randall to let them inside because they were cold. Approximately 20 minutes later, Randall gave Meyers a coat. Approximately 10 minutes after that, Randall let the teenagers inside.
Once inside the living room of the apartment, Kohn did not see Baker, Ziegler, Bennett, or Davis. She did, however, see blood on the walls, and she and Meyers asked Randall about the blood. He told them that they had all been fighting, and the blood came from one of the boys during the fight. Kohn said that she heard shuffling and yelling from the bedroom, but that she could not distinguish whose voices she heard. After a few minutes, Kohn testified, she asked Randall to stop what was happening. He opened the bedroom door and told them to be quiet because they were frightening Meyers and Kohn.
Kohn, Meyers, Randall, and the four-year-old child watched television for a while, and then the noise began again. Davis left the bedroom and joined them in the living room. At some point, Ziegler, Bennett and Allen moved into the bathroom, so when Meyers said she needed to use the bathroom, Ziegler, Baker, and Bennett moved into the bedroom. She could hear shuffling, like furniture moving, bumps on the wall, and yelling and talking for approximately 20 minutes. Kohn heard some people move into the bathroom again, and things became quiet for a while. Ziegler and Bennett came out of the bathroom, and Meyers was instructed to go into the bathroom to look after Baker and to clean him up. Kohn said she could only stay in the bathroom for a second, and that Baker's "eyes were swollen shut and he had a few gashes on his arms and the top of his head." (R. 307.) Kohn told Randall to take Baker home. Ziegler told her that Baker lived down the street and that they would walk him home.
Bennett and Ziegler told the women to go into the bedroom while they walked Baker home. Kohn testified that she looked out of the bedroom window and saw the four men walking behind the building. She said that Ziegler was walking behind Baker, that Baker fell down, and that Ziegler picked him up and yelled something to him. Bennett grabbed Baker's arm, and the men continued walking. Kohn said that, approximately 30 minutes later, the women left the bedroom and watched television in the living room with the child. William Ziegler, Jay Bennett, and Will Randall returned to the apartment. Bennett told Kohn that they had taken Baker to the stop sign and that he had walked the rest of the way home.
Ziegler and Bennett changed their clothing, and Randall changed his shirt, Kohn said. Davis and the child sat in the living room, and the others sat at the kitchen table. Kohn said that each of the three men had a black-handled knife, and each knife had a serrated edge. Ziegler cut a mark on Meyers's arm, Kohn said. She also testified that Ziegler displayed a white knife, and that he said he had taken the *134 knife away from Baker because he thought Baker intended to stab him with it. Ziegler gave all of the knives to Bennett, and he told Bennett to dispose of them. Kohn testified that Ziegler went toward the bedroom and bathroom areas of the apartment and returned with a plastic bag with some items inside. He left the apartment with the bag, saying he was going to throw some things into the dumpster.
Detective Donald Lunceford next testified that he interviewed the persons who had been at Ziegler's apartment on the night Baker was murdered. Ziegler gave a statement that was tape-recorded, and the tape was played for the jury. (R. 365.) Ziegler gave Detective Lunceford the following explanation regarding the beating:
"We started drinking and stuff like that for a little while and then Jay [Bennett] and Allen [Baker] started arguing about Allen's brother sleeping with his girl friend, stuff like that, about Allen sleeping with his girl friend, and they started fighting and I was questioning him about him snitching on me in Bayou La Batre because I got a warrant in Bayou La Batre. So he was hitting me, I hit him a few times and he called me a nigger a couple of times and we kept on fighting. Will [Randall] was hitting him just to get into it and the neighbors [have] called about a big disturbance, stuff like that, and the security guard come up there and told us to keep the ruckus down."
(Supp. R. 18.)[1]
Ziegler told the detective that all of them struck Baker, and that Davis hit him with a golf club. He said that they later took him out of the apartment and walked down the road. Ziegler said they pushed him off the road, and that Randall, the only one of them who had a knife, took Baker into the woods and stabbed him. Ziegler said that, after they returned to the apartment, he threw the clothes they were wearing that night into the dumpster, along with a towel Baker used to stop the flow of blood.
On cross-examination, Detective Lunceford testified that no physical evidence recovered connected Ziegler to the homicide.
Patricia Davis testified that Ziegler had been her boyfriend, and they were living together in Peach Place Inn apartments on February 19, 2000. She testified about the group arriving at their apartment to spend time together. She said that she and Meyers and Kohn left the apartment because the girls were hungry. When they returned to the apartment complex, Davis said, the neighbor downstairs told her she could hear scuffling in the apartment, and she wanted Davis to ask them to be quiet. Davis said that Bennett told her that they could not come inside the apartment, and that they should go back to the store to purchase some beer. Davis told him that she had no money, but he again told her to go, so they went back to the store. When they returned to the apartment the second time, Davis said, the men did not permit them to enter the apartment. Eventually, Davis was allowed to enter the apartment.
Davis testified that Baker was seated in the living room chair, and that Ziegler was standing in front of him. Baker's eyes and face were bloody. "He looked pretty beat up," Davis said. (R. 389.) Ziegler was asking Baker questions about what had happened in Louisiana when Ziegler was in jail. Davis testified that she could not remember what Baker said to Ziegler in response to his question, but that Ziegler struck Baker with an open hand approximately three times. Davis said she went *135 into the bedroom because her son was there, and she could hear Ziegler and Bennett asking questions of Baker, and she could hear Baker "getting hit." (R. 388.)
The men took Baker into the bathroom, and Will Randall let the girls into the apartment. Some time later, Ziegler and Bennett moved Baker into the bedroom, and Ziegler summoned Davis into the bedroom. She saw Baker sitting on the floor at the end of the bed. Ziegler was standing beside Baker, and Bennett was lying on the bed. Ziegler continued to question Baker, and Ziegler struck Baker on the side of his head. Bennett asked Baker a question, then punched Baker in the mouth and nose, causing his head to hit the wall. Davis said that Baker called Ziegler a "nigger," so she grabbed a golf club and hit Baker approximately four times. She hit his arms, which he held up over his head, Davis said. Davis then threw down the golf club and returned to the living room, she said. She said that Ziegler came out of the bedroom and asked her why she had struck Baker, to which she replied that she did not want anyone calling him a "nigger." Davis told Ziegler to get Baker cleaned up and to let him go. She further testified that she told Ziegler several times to let Baker go, and that he responded by telling Davis that it would be all right. (R. 430.)
Davis said that Ziegler and Bennett took Baker into the bathroom. Approximately 15 minutes later, she went into the bathroom to be sure that the men were going to let Baker go. She saw Baker sitting on the side of the tub, holding a towel to his head. Ziegler told her to go into the bedroom, and a few moments later, Ziegler, Bennett, and Baker left the apartment. Randall was in the apartment talking to Dawn Kohn. Davis asked Randall where they were going; he replied that he did not know and he ran out of the apartment.
Ziegler, Bennett, and Randall returned to the apartment after midnight and the three women asked them where Baker was. Ziegler told them that Baker had walked down the street. The three men went into the bathroom. Davis said that Randall and Bennett left the bathroom and that she went inside the bathroom to talk with Ziegler. Ziegler was sitting on the toilet cleaning blood from his shoes, Davis said. She asked what had happened, and Ziegler told her that Baker had gotten up and walked down the street. Davis testified that Ziegler did not change his clothes, but that Randall and Bennett put on fresh clothing before they left the apartment. Later, as some of the group sat at the kitchen table, Davis saw Ziegler with a black-handled knife with a serrated blade. She also saw Will Randall with a knife.
Davis said that, on the following day, Ziegler telephoned Allen Baker's stepmother. She heard Ziegler tell Baker's stepmother that there had been a fight the night before and that Baker had left. Davis said that she gave a statement about the events that occurred on the night of February 19, 2000, when the detectives told her, on February 23, 2000, that Allen Baker was dead.
On cross-examination, Davis testified that she had been charged with capital murder in regard to Baker's killing and that, as a result of a plea bargain, she would plead guilty to manslaughter.
Nineteen-year-old William Randall testified that Ziegler was his cousin. Randall had moved to the Mobile, Alabama, area a short time before the murder, and he had been working as a roofer with Ziegler and their uncle. Randall testified that everyone had been at Ziegler's apartment for approximately 45 minutes on the evening *136 of February 19, 2000, when the young women left the apartment to buy beer and cigarettes. Randall said that he and the other men went out on the balcony of the second-floor apartment and that Ziegler and Bennett made a bet with Allen Baker about how far he could jump off the balcony. When Baker got up on the balcony railing to jump, Randall, who testified that he was "playing around," pushed him off. Baker landed on his feet and returned to the apartment. As soon as he returned, Randall said, Ziegler hit Baker in the jaw. Baker fell down, got back up, and attempted to run away, but Ziegler told Randall to go get Baker, which he did. When Randall caught up with him, Baker asked him what was going on and why Ziegler had hit him. Randall told him he did not know, but he urged Baker to "come back and face him like a man." (R. 479-80.) Baker agreed and they walked toward the apartment. Randall testified that he walked behind Baker and that, before they reached the door of the apartment, he removed his knife from his pocket and held it near Baker. Baker did not see the knife. Ziegler and Bennett were on the balcony waiting for them. Randall returned his knife to his pocket after they went inside the apartment.
Randall testified that Baker sat in the living room chair, and that Ziegler and Bennett "started interrogating him," asking him "about what happened when [Baker] sent [Ziegler] to jail in Bayou La Batre about a stolen car." (R. 481-82.) Baker told Ziegler that he had not "snitched" on him. Ziegler cursed at Baker and hit him repeatedly on the jaw and on the side of his face. Randall said that he struck Baker, too, but only because Ziegler told him to do so. When the young women returned and knocked on the door, Ziegler told Randall to tell them to hold on for a minute, which he did. Ziegler "was still interrogating [Baker]," Randall said. (R. 483.) Ziegler told Randall to let Davis into the apartment. Randall let Davis inside, and he stepped outside to talk to the teenage girls. Randall said he stayed outside for approximately 45 minutes.
Randall said that, when he and the girls entered the apartment, he could hear a noise from the bedroom that sounded like someone was being cursed at and hit. Ziegler and Bennett were in the bedroom with Baker at that time. Randall testified that the teenage girls asked him what was going on, and Randall told them that the men were arguing. Davis then went into the bedroom. Randall said that they then heard more noises that sounded like someone was being hit and cursed at, but he could not discern any words.
Randall testified that Davis came out of the bedroom, and she was angry. She said that she had hit Baker with a golf club because he had called Ziegler a "nigger." Randall became angry when he heard this, because Ziegler is his cousin. Randall went into the bedroom. Baker's face was bloody and he was leaning up against the window sill, Randall said. He asked Ziegler when the beating was going to stop, and Ziegler told him that he was going to stop in a moment. Randall returned to the couch, and he continued to hear noises that sounded like someone being beaten with fists.
Randall testified that Ziegler and Bennett took Baker into the bathroom and that soon he heard noises that sounded like someone was being beaten. Randall testified that he went toward the bathroom, opened the door, and saw Bennett swinging an object covered with a towel toward the bathtub. Randall then went inside the bathroom and saw that Baker was in the bathtub. Ziegler and Bennett were next to the tub. Randall testified that he kicked Baker in the face and urinated on him because he *137 was angry that Baker had called his cousin a "nigger." Randall left the bathroom, he said, and Ziegler and Bennett followed him into the living room.
Sarah Meyers went into the bathroom to help Baker clean up. Randall looked into the bathroom and observed that Baker's face was bruised and swollen. Randall testified that he "semi-apologized" to Baker for what he had done. Meyers and Baker came out of the bathroom. Ziegler and Bennett took Baker to the area between the bathroom and the bedroom and talked among themselves. Thereafter, the three men left the apartment. Ziegler returned and asked Randall if he wanted to go for a walk, and Randall left the apartment with him.
Ziegler led the group down the road, Randall said, and Ziegler continued to curse at Baker as they walked along. Randall said that he "was arguing with [Baker] too," because he was still angry that Baker had called Ziegler a "nigger." (R. 503.) Randall testified that he pulled out his knife and stabbed Baker in the side and Baker fell down. Ziegler picked Baker up, told him, "You're lucky I don't kill you right here." (R. 505.) The men continued walking down the road, and then Ziegler stopped. Ziegler told Baker to walk into the woods, and he did. Randall testified that Ziegler followed Baker into the woods and that he followed them. Randall said that Bennett stood near the road. Randall testified that he thought that Ziegler might be planning to kill Baker in the woods.
Randall testified that after they had taken Baker 10 or 15 yards into the woods, Ziegler stopped walking and began stabbing Baker in the head and chest. Baker fell to the ground and "was squirming around," Randall testified. Ziegler continued to curse at Baker, accusing him of "ratting" on him. Randall testified that he stabbed Baker in his side with a pocket knife. Randall said that he walked out of the woods after he had stabbed Baker, because he did not want to stay in the woods any longer. Bennett then walked into the woods, Randall said. Randall testified that Bennett and Ziegler remained in the woods for approximately five minutes, and then they walked out to the road, folding their knives. Ziegler told Randall to "go in the woods and finish [Baker] off." (R. 514.) Randall refused, and Ziegler walked back into the woods. He returned a couple of minutes later and said that he had cut Baker's throat. He also said that "cutting his throat was like cutting a nylon cord." (R. 515.) The three men returned to the apartment, and they disposed of their knives and the clothing they were wearing during the murder.
Randall testified that, when he gave his statement to Detective Lunceford, he did not tell the detective that he and Ziegler had stabbed Baker because he was trying to protect himself and his cousin. Instead, he told the detective that Jay Bennett had stabbed Baker. Randall testified that he was aware that Ziegler had implicated him in Baker's murder. Randall testified that he and the prosecution had negotiated a plea agreement pursuant to which, if he cooperated and testified truthfully in trials for Baker's murder he would be convicted of murder instead of a capital murder and would be sentenced to 20 years to life imprisonment.
David Lott, an investigator with the Alabama Department of Forensic Sciences, testified that he videotaped the wooded area where Baker's body was found. The videotape was played for the jury. Lott also testified that he removed a piece of fabric from a living room chair at Ziegler's residence. William Jones, a DNA scientist at the Alabama Department of Forensic Sciences, testified that Baker was "the *138 contributor" of blood recovered from the living room chair and blood Jones recovered from a wall outside Ziegler's apartment. (R. 619.)
Theodis Ridgeway testified that he met Ziegler, whom he knew as "Ziggy," when they shared a cell in the Mobile jail. Ridgeway testified that Ziegler told him that he was in jail "for killing a snitch. A guy that was a friend of his by the name of Allen." (R. 639.) Ridgeway testified that Ziegler told him details of the crime:
"Well, he said they lured Allen to these woods and  not too far from his house and that they killed him. They beat him with a golf stick, cut him, stabbed him, and they had someone stand watch so if anybody passing by (sic). And he said they even tried to cut his head off."
(R. 639-40.)
The defense called as witnesses William Randall's sister and his aunt, Ziegler's mother,[2] Odella Wilson, who testified that Randall had a bad reputation among the members of the family with respect to his truthfulness. Ziegler's mother also testified that Randall told her that Jay Bennett fought with Baker because Baker had told Bennett that he had had intimate relations with Bennett's wife. Randall told her that he had punched Baker, and that Davis had hit Baker with a golf club. Ziegler's mother testified that Randall told her that Ziegler had spent most of the night trying to stop the beating. She further testified that Randall told her that Bennett murdered Baker and that Ziegler had walked away from the men and had begun walking back to the apartment before Bennett took Baker into the woods. On cross-examination, Wilson acknowledged that Randall had lied to her "several times about all different things," so she was unsure whether he was telling her the truth when he told her that Bennett had murdered Allen, and that Ziegler had not participated in the crime. (R. 722.) She stated that she believed that parts of what Randall told here were probably a lie. Wilson further acknowledged that it appeared to her that Randall had been attempting to protect himself and to indicate that Ziegler had no involvement in the crime. She testified that Ziegler had been in "tough man contests." (R. 726.)
Ziegler's grandmother, Joan McGhee, testified that she was also Randall's grandmother. McGhee said that Randall told her that neither he nor Ziegler were involved in the murder, and that Jay Bennett had fought with Baker and had pushed Baker into the woods. She also testified that Randall's reputation with respect to truthfulness was very bad.
John Ziegler testified that William Ziegler and William Randall were his nephews. He stated that Randall had a bad reputation for truthfulness and that he would not believe Randall if he testified under oath. He then testified that Randall had told him that he had killed Baker. He also stated that Randall told him that Ziegler was not around at the time and that Ziegler knew nothing about the killing.
After the jury returned with its verdict finding Ziegler guilty of the capital murder of Allen Baker, the sentencing phase of the trial was held. Odella Wilson testified that she had raised Ziegler from the age of two and one-half years, after his mother, her sister, died. She testified that the man to whom she was married during most of Ziegler's childhood was an abusive alcoholic and that he was more abusive to Ziegler than to the couple's own children. She testified that Ziegler was a good brother to his younger siblings. Finally, *139 Wilson testified that Ziegler knows right from wrong and that he has the ability to control his behavior.
James Chudy, a clinical psychologist, testified that Ziegler grew up in a rejecting, abusive environment and that, as a result of the maltreatment, he had developed a great deal of shame-based anger. Dr. Chudy testified that calling him a "nigger" could provoke an overreaction from Ziegler because Ziegler's father was from Mexico and he was not African-American. Dr. Chudy stated that Ziegler's IQ was in the average range and that he could understand right from wrong.
Following deliberations, the jury, by an 11-1 vote, recommended that Ziegler be sentenced to death. At the subsequent sentence hearing before the trial court, a sentence of death was imposed. This appeal follows.

I.
Ziegler contends that the jury charge failed to inform the jurors that Ziegler could be guilty of capital murder only if they determined that he had a particularized intent to kill. The State notes that Ziegler did not raise this objection at trial, so the claim is to be reviewed only for plain error. The State argues that the jury charge as a whole regarding accomplice liability and intent adequately informed the jury that, in order to convict Ziegler of capital murder, it had to find that Ziegler possessed the particularized intent to kill the victim. We agree with the State.
Because Ziegler did not object at trial to the jury instruction he now claims was improper, we review this issue under the plain error standard of review. Rule 45A, Ala. R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Plain error has been defined as error so obvious that the failure to notice it would seriously affect the fairness or the integrity of judicial proceedings. "'"`Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.'"'" Turner v. State, (Ms. CR-99-1568, Nov. 22, 2002) ___ So.2d ___, ---- (Ala.Crim.App.2002)(quoting Ex parte Windsor, 683 So.2d 1042, 1061 (Ala.1996), quoting in turn other cases). Plain error is one that not only seriously affects an appellant's substantial rights, but also had an unfair impact on the jury's deliberations. United States v. Young, 470 U.S. 1, 16-17 n. 14 (1985). Alabama courts have often stated that the failure to object at trial weighs against a claim of prejudice. E.g., Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985); Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991). Lastly, the United States Supreme Court stated, "As we have stressed on more than one occasion, the Constitution entitles a criminal defendant to a fair trial, not a perfect one. E.g., United States v. Hasting, 461 U.S. 499, 508-509 (1983); Bruton v. United States, 391 U.S. 123, 135 (1968)." Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). With the foregoing principles in mind, we review Ziegler's claim of error.
*140 Ziegler contends that the following portion of the jury charge was plainly erroneous:
"The law of this state says that when one or more persons enter upon unlawful purposes with common intent to aid and encourage each other in anything within their common design, each is criminally responsible for everything which may, as a consequence, subsequently result from such unlawful purpose, whether or not such results were contemplated."
(R. 849-50.) Ziegler cites Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), for the proposition that the death penalty cannot be imposed when the victim was killed, not by the defendant, but by an accomplice, and when the defendant lacked the specific intent to kill. He argues that the instruction in his case permitted the jury to find him guilty of capital murder if it determined that he aided and abetted any of the codefendants and it also determined that Ziegler intended that Baker's abduction result in physical injury to Baker. Ziegler contends that, as instructed by the trial court, the jury was not required to find that Baker's death was a result that was intended by Ziegler. We disagree.
In reviewing a jury instruction to which an appellant has objected, we do not review the jury instruction in isolation. Instead, we consider the jury charge as a whole, and we consider the instructions like a reasonable juror may have interpreted them. Smith v. State, 795 So.2d 788, 827 (Ala.Crim.App.2000).
Alabama appellate courts have repeatedly held that, to be convicted of capital offense and sentenced to death, a defendant must have had a particularized intent to kill and the jury must have been charged on the requirement of specific intent to kill. E.g., Gamble v. State, 791 So.2d 409, 444 (Ala.Crim.App.2000); Flowers v. State, 799 So.2d 966, 984 (Ala.Crim.App.1999); Duncan v. State, 827 So.2d 838, 848 (Ala.Crim.App.1999). Our review of the court's entire jury charge convinces us that the jury was fully instructed on the intent-to-kill requirement and that no plain error occurred.
Although Ziegler contends that the jury was never instructed that he could be held legally responsible for the murder only if he had a particularized intent that the accomplice kill, a review of the jury charge discloses otherwise. In the initial portion of the jury charge, the trial court instructed the jury that, in order to sustain the allegations of the indictment, the State had to prove that Ziegler "intentionally caused the death of Allen Baker." (R. 844.) The court repeatedly instructed the jury that proof of an "intentional murder" was required. (R. 844-45, 847, 848-49.) In its instruction regarding accomplice liability, the trial court repeatedly instructed the jury that a person is legally accountable for the acts of another if he has the specific intent to assist the other person in the commission of the underlying offense, for which there is a "community of interest or unlawful intent." (R. 850-52.)
The trial court's jury charge fully informed the jurors that, before they could render a guilty verdict on the capital-murder charge, they would have to find that the State proved beyond a reasonable doubt that Ziegler had the specific intent to kill Allen Baker, even if he did not strike the fatal blows. The instructions on intent and on accomplice liability, when considered together, were proper, and they were thorough and specific enough to ensure that a guilty verdict would not be returned unless the jury found that Ziegler had the specific intent to kill.
Furthermore, in Jones v. State, 753 So.2d 1174 (Ala.Crim.App.1999), this Court reviewed the specific jury instruction to which Ziegler objects, and which is quoted *141 earlier in this discussion. We acknowledged in Jones that the instruction might have been confusing and might have appeared to be prejudicial, but we held:
"The trial court's instruction that the jury find that Jones had the requisite intent immediately preceded its instruction on accomplice liability. When read together, and especially in light of the fact that the instruction on accomplice liability immediately followed the trial court's instruction on the necessity of finding a particularized intent to kill, we find no reversible error in the trial court's charge to the jury. We acknowledge that the portion of the trial court's instruction that states, `they are each responsible for everything which was consequently and subsequently the result from such unlawful purpose whether specifically contemplated or not' may be confusing and may appear prejudicial. However, we believe, in light of the concreteness of the trial court's instruction on the finding of particularized intent and in light of the evidence, argument, and instructions presented at trial, the jury, even if it convicted Jones based on the theory of accomplice liability, found that Jones possessed the necessary intent to kill. Therefore, the trial court's instructions on intent and accomplice liability when given a reasonable construction in light of the facts adduced at trial did not constitute reversible error. Davis v. State, 740 So.2d 1115 (Ala.Cr.App.1998); Roberts v. State, 735 So.2d 1244 (Ala.Cr.App.1997); and George v. State, 717 So.2d 827 (Ala.Cr.App.1996), rev'd on other grounds, 717 So.2d 844 (Ala.1996)."
753 So.2d at 1186.
As we found in Jones, we find here that when the specific jury instruction to which Ziegler now objects is viewed along with the entire jury charge, it is clear that the jury was adequately informed that Ziegler could not be convicted of capital murder unless it determined that Ziegler had the specific, particularized intent to kill. Furthermore, sufficient evidence was admitted from which a rational factfinder could have concluded that Ziegler had the specific intent to kill. For the foregoing reasons, we find that no plain error occurred with regard to the jury instruction. Ziegler is not entitled to any relief on this claim.

II.
In Issue II of his brief, Ziegler contends that the trial court committed plain error when it failed to give an instruction on the use of William Randall's accomplice testimony. In Issue III of his brief, Ziegler argues that, without Randall's accomplice testimony, there was insufficient evidence to convict him of the murder of Allen Baker. Because the legal principles and the evidence relevant to our analysis of these two issues are intertwined, we will consider the issues together.
With regard to Issue II, Ziegler cites § 12-21-222, Ala.Code 1975; he appears to argue that the jury should have been instructed that Ziegler could not be convicted without corroboration of Randall's accomplice testimony. The State argues that the court's failure to instruct the jury on accomplice testimony was not plain error because, it says, the prosecution presented sufficient corroborative evidence other than that of Ziegler's accomplices, William Randall and Patricia Davis.[3] The State also argues that the lack of an instruction *142 was not plain error because, it says, the jury was informed of Randall's and Davis's accomplice status and of their plea agreements, as well as the potential bias of those who had made plea agreements. With regard to Issue III and Ziegler's argument that, without Randall's accomplice testimony, the evidence was insufficient to support his conviction, the State argues that Randall's and Davis's testimony[4] was sufficiently corroborated by the testimony of other witnesses and that the conviction was proper.
Ziegler's claim that the trial court erred when it failed to give an instruction on corroboration of accomplice testimony is being raised for the first time in this Court. Therefore, we review the lack of the instruction for plain error. Rule 45A, Ala. R.App. P. We find no plain error in the trial court's failure to sua sponte instruct the jury on accomplice testimony.
Section 12-21-222, Ala.Code 1975, provides:
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
Although an instruction on corroboration of accomplice testimony should generally be given in cases such as this one, we have recognized on numerous occasions that the error of failing to instruct the jury on the need for corroborative evidence is harmless when the testimony of the accomplice has been corroborated. E.g., Arthur v. State, 711 So.2d 1031, 1058 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997). In Duke v. State, 889 So.2d 1, 23 (Ala.Crim.App.2002), we recently stated:
"This Court has long applied the harmless-error rule in capital cases where the circuit court failed to instruct the jury on the requirement that an accomplice's testimony be corroborated. See, e.g., Hyde v. State, 778 So.2d [199] at 221 [(Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000)]; Arthur v. State, 711 So.2d 1031, 1058-59 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997); Gurley v. State, 639 So.2d 557 (Ala.Crim.App.1993); Frazier v. State, 562 So.2d 543, 558 (Ala.Crim.App.), rev'd on other grounds, 562 So.2d 560 (Ala.1989).
"Even though the court did not instruct the jury that Samra was an accomplice, his status as a codefendant was made abundantly clear through his testimony. Moreover, the circuit court cautioned the jury to look for and to consider possible bias on the part of a witness. Finally, although Samra testified against his codefendant, Duke was not convicted based solely upon Samra's testimony. As previously noted, the State presented numerous witnesses and substantial physical evidence connecting Duke with the murders. This other evidence corroborated Samra's testimony and was sufficient to support Duke's conviction. Accordingly, any error in the court's failure to charge the jury on the necessity of accomplice corroboration was harmless."
*143 Therefore, to determine whether the trial court's failure to charge the jury on accomplice testimony was reversible error, we must examine the record to determine whether the accomplice testimony was corroborated. Examination of the record is also required to determine whether there was sufficient corroboration in this case to uphold Ziegler's capital-murder conviction, after the testimony of William Randall and Patricia Davis[5] is eliminated. We note, however, that this argument, presented in Issue III of Ziegler's brief, is reviewed for plain error, because Ziegler did not raise any claim in the trial court regarding the insufficiency of evidence apart from William Randall's testimony.
We have often stated that the test for determining the sufficiency of the evidence corroborating the accomplice testimony is through a "subtraction process." That is, the testimony of the accomplice must be eliminated, and then, if there remains sufficient incriminating evidence tending to connect the defendant with the commission of the charged offense, there is sufficient corroboration to sustain the jury's verdict. E.g., Taylor v. State, 808 So.2d 1148, 1175 (Ala.Crim.App.2000). We have further recognized:
"When the testimony of the accomplice is subtracted, the remaining testimony does not have to be sufficient by itself to convict the accused. As we stated in Ingram v. State, 779 So.2d 1225, 1259 (Ala.Cr.App.1999):
"`A felony conviction cannot be had on the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense. Kuenzel v. State, [577 So.2d 474 (Ala.Cr.App.1990)]; § 12-21-222. The corroboration evidence need not be strong, nor sufficient of itself to support a conviction, the reasoning being that it legitimately tend to connect the accused with the offense; it need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Kuenzel v. State; Andrews v. State, 370 So.2d 320 (Ala.Crim.App.1979).'"
Johnson v. State, 820 So.2d 842, 869 (Ala.Crim.App.2000).
The defendant's proximity to the crime scene has been considered to be a relevant consideration in the determination of whether sufficient corroboration of the accomplice's testimony exists. Ex parte Scott, 728 So.2d 172, 178 (Ala.1998).
Having reviewed the record, we find that, even if William Randall's accomplice testimony is subtracted, the evidence introduced at Ziegler's trial amply corroborates that testimony and tends to connect Ziegler with Baker's murder. Vickie Bosarge testified that, a short time before the murder occurred, she heard Ziegler tell Baker that he was a "walking dead man." Her testimony provides evidence of Ziegler's intent. Officer Charles Bailey testified that the victim's body was found approximately two tenths of a mile from Ziegler's residence. The security guard and a neighbor at Ziegler's apartment complex testified about a loud scuffle that occurred on the night Baker was killed. The security guard testified that, the next day, Ziegler asked him whether he had seen anything or anyone on the road down which Ziegler and the others had taken Allen. Sarah Meyers and Dawn Kohn testified *144 as to the beating Baker sustained in Ziegler's apartment and about the motive expressed for the beating. They also testified that Ziegler walked with Baker after the men left the apartment and that the men disposed of knives and clothing when they returned to the apartment. In Ziegler's statement to the police, he acknowledges his involvement in the beating. Theodis Ridgeway, Ziegler's cellmate, testified that Ziegler told him that he was in jail for killing a snitch, and he provided details of the murder to Ridgeway.
Considered as a whole, even after eliminating Randall's and Davis's accomplice testimony, the State presented more than sufficient evidence tending to connect Ziegler with the crime. Therefore, Ziegler's claim that the evidence was insufficient to support his conviction must fail. Likewise, his claim that the trial court committed plain error when it failed to instruct the jury on the use of accomplice testimony must also fail. The accomplice testimony was amply corroborated, and the trial court's failure to instruct the jury was, at most, harmless error, and does not warrant a reversal. Our resolution of this issue is further supported by the fact that the jury was fully informed of Randall's and Davis's status as accomplices and of their plea bargains with the State. The trial court instructed the jury that it should consider with "more caution" the testimony of witnesses who had struck plea bargains with the State. (R. 841.) The absence of a specific accomplice instruction was harmless, at most. Hyde v. State, 778 So.2d 199, 221 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000).
Based on the foregoing, we find no plain error in the proceedings regarding the accomplice testimony. Ziegler's claim in Issue II regarding the lack of a jury instruction is due to be denied, as is the claim in Issue III challenging the sufficiency of the evidence. Ziegler is not entitled to any relief on these claims.

III.
In Issue IV of his brief to this Court, Ziegler argues that the trial court's instructions to the jury on the "especially heinous, atrocious or cruel" aggravating circumstance, § 13A-5-49(8), Ala.Code 1975, were unconstitutionally vague. Specifically, he argues that the trial court's instructions failed to narrow the jury's discretion to apply this circumstance because, he argues, they did not inform the jury that the circumstance applies only to homicides that are conscienceless and pitiless, and because they did not define the terms "heinous, atrocious or cruel." Ziegler did not raise those claims at trial, although he objected to these jury instructions on other grounds. Therefore, we must review the claim for plain error. Rule 45A, Ala. R.App. P.
The § 13A-5-49(8), Ala.Code 1975, aggravating circumstance states that "[t]he capital offense was especially heinous, atrocious or cruel compared to other capital offenses." The trial court instructed the jury as follows on this aggravating circumstance:
"Finally, the State contends that the offense here committed was especially heinous, atrocious, or cruel. I charge you in that respect that all murders are to an extent heinous, atrocious, or cruel; however the aggravating circumstance here is limited to those instances where the murder has been proven to be unnecessarily torturous as compared to other capital murders."
(S.R. 125.)[6] Defense counsel objected to the charge on grounds that the jurors had *145 no ability to compare this capital murder with any other capital murders, as they were instructed to do, and that their discretion was not properly limited by the instruction. (S.R. 137-38.) The jury requested additional instructions on the aggravating and mitigating circumstances. With regard to the § 13A-5-49(8) aggravating circumstance, the trial court stated that the aggravating circumstance was "limited to those instances which are necessarily torturous as compared to other capital murders." (S.R. 141.) Defense counsel again argued that the court's instruction was faulty because the jurors had not been presented with any evidence that would allow them to compare whether this capital case was worse or "better" than others. (S.R. 146.)
Ziegler now argues that the jury charges on this aggravating circumstance are incorrect and unconstitutionally vague because they did not define the terms "heinous, atrocious or cruel," and they did not inform the jury that the aggravating circumstance applied only to conscienceless and pitiless homicides. Although the court's instructions on the § 13A-5-49(8) aggravating circumstance were not overly thorough, we find no plain error in the trial court's instructions.[7]
"In setting forth the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1197-98, 108 L.Ed.2d 316 (1990), for the proposition that `an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.'"
Williams v. State, 710 So.2d 1276, 1306 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997).
In Ex parte Kyzer, 399 So.2d 330 (Ala.1981), the Alabama Supreme Court extensively discussed the "heinous, atrocious or cruel" aggravating circumstance, and set the standards for review of jury instructions on that aggravator. In addressing an appellant's challenge to a jury instruction on this aggravating circumstance, the Alabama Supreme Court held:
"In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), this Court held that the standard applicable to the `especially heinous, atrocious, or cruel' aggravating circumstance under § 13A-5-49(8) is that for a crime to fit within that section it must be one of `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'"
Ex parte Bankhead, 585 So.2d 112, 124 (Ala.1991).
Similarly, when we discussed an appellant's claim that the jury charge on the "heinous, atrocious or cruel" aggravating circumstance did not sufficiently limit the jury's discretion, we held:
"The trial court's charge complies with the Kyzer standard. The trial court specifically informed the jury that this aggravating circumstance was limited to `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' This standard has been consistently held to adequately narrow this circumstance as required by the Eighth Amendment. See Price v. State, [725 So.2d 1003 (Ala.Crim.App.1997)]. We recognize that the instruction omitted the phrase `compared to other capital offenses.' However, when the instruction is viewed in its entirety, *146 the instruction effectively narrowed this circumstance and informed the jury that it could find this aggravating circumstance to exist only if it concluded that the `capital offense was especially heinous, atrocious or cruel compared to other capital offenses.' Therefore, reversal is not warranted."
Broadnax v. State, 825 So.2d 134, 210 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001).
We find that the trial court's instruction in this case, while it could have been more thorough, effectively narrowed the scope of the aggravating circumstance and informed the jury that it applied only to those capital offenses that were "unnecessarily torturous" to the victim. Thus, the instruction did not violate the protections provided by the Eighth Amendment. No plain error occurred, and Ziegler is not entitled to any relief.
Even if we had determined that the court's instruction on the "heinous, atrocious or cruel" aggravating circumstance was erroneous  and we do not  Ziegler would not be entitled to a reversal. In Lawhorn v. State, we found that the trial court erred because its jury instruction on this statutory aggravating circumstance contained only the bare terms of the statute and failed to give the jury any guidance on the meaning of the terms in the context of the capital crime. Lawhorn v. State, 581 So.2d 1159, 1174-75 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.1991). We were not compelled to reverse Lawhorn's death sentence based on that error. Instead, we conducted a harmless-error analysis, and stated:
"To determine whether the trial court's failure to instruct properly was harmless error, the Clemons [v. Mississippi, 494 U.S. 738 (1990)] Court suggests one of two inquiries: (1) whether beyond reasonable doubt the sentence would have been the same had the `especially heinous' circumstance not been considered by the jury at all, or (2) whether beyond reasonable doubt the result would have been the same had the circumstance been properly defined in the jury instructions. See also Henry v. Wainwright, 721 F.2d 990, 995 (5th Cir.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) (wherein the court, in holding harmless the trial court's failure to instruct that aggravating circumstances must be found beyond a reasonable doubt, stated that `[f]or the failure to give the instruction to be harmless, the evidence must be so overwhelming that the omission beyond a reasonable doubt did not contribute to the verdict').
"For purposes of our review of this case, we employ the second Clemons inquiry. There is no question, at all, that, had the jury been properly instructed, it would still have returned a recommendation of death because the facts presented to the jury established, beyond any doubt, that this crime was especially heinous, atrocious, or cruel when compared to other capital offenses. The evidence of this circumstance is overwhelming; the facts so conclusively establish it, that no rational jury, properly instructed, could have found otherwise. The evidence is unconflicting that appellant directly participated in a conscienceless, pitiless, and torturous murder. Berry's last minutes were obviously filled with terror, fear, and knowledge that his death was imminent, and he experienced a high degree of prolonged pain before his death. All of this was accomplished by appellant with complete indifference  complete indifference to Berry's pain and terror and complete indifference to the value of human life, *147 which he found to be worth $50. Clearly, this evidence sets this crime apart, for the degree of heinousness, atrociousness, and cruelty of this offense exceeds that which would be common to all capital offenses. By any standard acceptable to civilized society, this crime was outrageously wicked and shockingly evil."
Lawhorn, 581 So.2d at 1177.
If we had found the trial court's jury instruction in this case to be constitutionally inadequate, we would have also found that error to be harmless. The evidence here clearly demonstrated that Ziegler actively participated in the prolonged brutal beating of the slightly built victim, and then led him down a dark road and into the wooded area where, without a doubt, Baker was filled with terror and the knowledge that his death was imminent. Most certainly, the evidence overwhelmingly established this aggravating circumstance. Many cases have contained considerably less violence and abuse to the victim, and yet the trial court's finding that the heinous, atrocious or cruel aggravating circumstance applied has been affirmed. E.g., Key v. State, [Ms. CR-99-0220, March 1, 2002] --- So.2d ---- (Ala.Crim.App.2002); Hocker v. State, 840 So.2d 197 (Ala.Crim.App.2002); Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000). Therefore, even if we had determined that the jury instruction was improper, we would have found that, had the jury been properly instructed, it would still have returned a recommendation of death because the facts presented to the jury established that this crime was especially heinous, atrocious, or cruel when compared to other capital offenses.
Ziegler is not entitled to any relief on his claim.

IV.
In Issue V of his brief to this Court, Ziegler argues that the trial court erred to reversal when it failed to instruct the jury that it could consider his age as a statutory mitigating circumstance, in accordance with § 13A-5-51(7), Ala.Code 1975. He argues that the trial court should have directed "the jury's attention to the fact that the legislature mandated that the defendant's age at the time of the commission of the offense was to be considered...." (Ziegler's brief at p. 66.) This argument is being raised for the first time. Ziegler did not request that the court instruct the jury on age as a mitigating circumstance, and he did not object to the trial court's failure to sua sponte instruct the jury on age as a mitigating circumstance, either at the end of the court's initial charge or at the end of the court's supplemental charge. Therefore, we review this claim for the existence of plain error. Rule 45A, Ala. R.App. P. We find no plain error in the court's failure to sua sponte charge the jury on this mitigating circumstance.
Ziegler was 24 years old when this capital murder was committed. He had been living the life of an adult, that is, he had started his own business, had been married and was paying child support, and lived in his own apartment. In their arguments during the sentencing phases of the trial, defense counsel did not argue to the jury or to the trial court that Ziegler's age should be considered as a mitigating circumstance. The trial court specifically found that Ziegler's age was a mitigating circumstance. (C. 290.)
This Court has considered a claim similar to Ziegler's in McGriff v. State, [Ms. CR-97-0179, Aug. 31, 2001] ___ So.2d ---- (Ala.Crim.App.2001)(opinion on return to remand). McGriff argued that the trial court had erred when it failed to sua *148 sponte charge the jury on all of the statutory mitigating circumstances. We disagreed, and held:
"The trial court did not have an obligation to instruct on a statutory mitigating circumstance that was not relied upon or argued during the penalty phase. As we stated in Johnson v. State, 820 So.2d 842, 875 (Ala.Crim.App.2000), [aff'd], 820 So.2d 883 (Ala.2001):
"`Johnson did not present any evidence at the penalty phase concerning the statutory mitigating circumstances enumerated in § 13A-5-51....
"`....
"`The trial court's instructions were consistent with the evidence presented at the penalty phase; they did not constitute plain error. As we stated in Pressley v. State, 770 So.2d 115, 141-42 (Ala.Cr.App.1999):
"`"The trial judge had no burden to recognize a statutory mitigating circumstance not presented by the defense, and proffer it to the jury.... There is no requirement that the trial court read the entire list of statutory mitigating circumstances to a jury where there was no evidence offered to support each circumstance. Holladay v. State, 629 So.2d 673, 687 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994). The trial court's instructions were sufficient. The trial court did not commit plain error by not sua sponte instructing the jury on a statutory mitigating circumstance not offered by Pressley."
"`See also Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).'"
McGriff, ___ So.2d at ___.
As in McGriff, the trial court here instructed the jury on the mitigating circumstances proffered by the defense. The court also instructed the jury to consider as mitigating "any aspect of the crime or of William John Ziegler's background and life in considering mitigating circumstances." (S.R. 125.) Based on the foregoing caselaw, on the fact that Ziegler never offered any evidence or argument that his age was a mitigating circumstance, and on the fact that the trial court found Ziegler's age to be a mitigating circumstance, we decline to hold that the trial court committed plain error when it failed to sua sponte charge the jury that it should consider Ziegler's age of 24 years as a statutory mitigating circumstance. Ziegler is not entitled to any relief on this claim.

V.
In Issue VI of his brief, Ziegler argues for the first time that Alabama's method of execution, electrocution, is unconstitutional. Ziegler's claim has been rendered moot by a recent legislative enactment that changed the means by which an execution is carried out. We recently addressed the precise issue Ziegler raises:
"In July 2002, the Alabama Legislature amended § 15-18-82, Ala.Code 1975, that defines the method of execution. Section 15-18-82(a), now reads:
"`(a) Where the sentence of death is pronounced against a convict, the sentence shall be executed at any hour on the day set for the execution, not less than 30 nor more than 100 days from the date of sentence, as the court may adjudge, by lethal injection unless the convict elects execution by electrocution as provided by law. If electrocution is held unconstitutional, *149 the method of execution shall be lethal injection.'
"Section 15-18-82.1, Ala.Code 1975, was also added at that time. This statute reads, in part, as follows:
"`(a) A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution. The sentence shall be executed pursuant to Section 15-18-82.
"`....'
"`This Act [authorizing death by lethal injection] applies to all persons currently on Alabama's death row.' Tomlin v. State, [Ms. CR-98-2126, May 31, 2002] ___ So.2d ___, ---- (Ala.Crim.App.2002). Because the method of execution has been changed to allow death by lethal injection, Turner's argument challenging the constitutionality of electrocution as a method of imposing the death penalty is moot. Harrison v. State, 869 So.2d 509 (Ala.Crim.App.2002), and Duke v. State, [Ms. CR-98-1218, May 31, 2002] ___ So.2d ---- (Ala.Crim.App.2002)."
Turner v. State, ___ So.2d at ___.
For the reasons discussed in Turner, we find that Ziegler's argument that Alabama's method of execution is unconstitutional is moot.

VI.
Ziegler argues in Issue VII of his brief to this Court that his death sentence must be vacated because the trial court's sentencing order fails to comply with the mandatory requirements of § 13A-5-47, Ala.Code 1975, in that it fails to address each statutory aggravating and mitigating circumstance. The State concedes that the trial court failed to address all of the statutory aggravating and mitigating circumstances, but contends that the error is harmless.
Our review of the trial court's sentencing order convinces us that the cause must be remanded for compliance with § 13A-5-47, Ala.Code 1975. Section 13A-5-47(d) provides, in relevant part, that the sentencing court "shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52." Although the trial court addressed those statutory aggravating circumstances and statutory mitigating circumstances that it expressly found to exist, it did not make specific findings regarding the existence or nonexistence of the remainder of the statutory aggravating and mitigating circumstances set forth in §§ 13A-5-49 and 13A-5-51. Therefore, based on the requirements of § 13A-5-47(d), Ala.Code 1975, we remand this cause to the trial court for it to amend its sentencing order. The amended sentencing order shall include specific findings regarding the existence or nonexistence of each statutory aggravating circumstance in § 13A-5-49 and each statutory mitigating circumstance in § 13A-5-51. If necessary, the court may reweigh the aggravating and mitigating circumstances and resentence Ziegler. See, e.g., Key v. State, [Ms. CR-99-0220 March 1, 2002] ___ So.2d ___, ---- (Ala.Crim.App.2002); McNabb v. State, 887 So.2d 929, 989 (Ala.Crim.App.2001).
The trial court shall submit an amended sentencing order in compliance with § 13A-5-47 to this Court within 42 days of the date of this opinion. We pretermit our plain-error review of Ziegler's death sentence pending the trial court's return to remand. On return to remand, we will specifically address the impact of Ring v. *150 Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), as it applies to the circumstances of this case.
AFFIRMED AS TO CONVICTION; REMANDED WITH DIRECTIONS AS TO SENTENCING.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.

On Return to Remand
COBB, Judge.
William John Ziegler was convicted of capital murder for murdering Russell Allen Baker during the course of a kidnapping. Following the jury's recommendation, by a vote of 11-1, that Ziegler be sentenced to death, the trial court imposed the death sentence. On February 28, 2003, we affirmed Ziegler's conviction and remanded the cause for compliance with § 13A-5-47(d), Ala.Code 1975, which requires the trial court to enter specific written findings concerning the existence of aggravating circumstances and mitigating circumstances. The trial court has complied with our directions on remand, and the case is now before this Court for completion of our review.

I.
In its amended sentencing order filed on April 14, 2003, the trial court found the following aggravating circumstances to exist: that the offense was committed while the defendant was under a sentence of imprisonment, § 13A-5-49(1), Ala.Code 1975; that the offense was committed during the course of a kidnapping, § 13A-5-49(4), Ala.Code 1975; and that the offense was especially heinous, atrocious or cruel when compared to other capital offenses, § 13A-5-49(8), Ala.Code 1975. The trial court found the following statutory mitigating circumstances to exist: that the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, § 13A-5-51(2), Ala.Code 1975; and the age of the defendant at the time of the crime, § 13A-5-51(7), Ala.Code 1975. The trial court found as nonstatutory mitigating circumstances that Ziegler would provide comfort and support for his family and others if he were sentenced to life imprisonment without parole, and that Ziegler's childhood was difficult and deprived. The trial court stated in its amended sentencing order: "The Court finds that its original determination that the aggravating circumstances outweighed the mitigating circumstances and that the recommendation of the jury was due to be followed is correct. It is not necessary to reweigh the aggravating and mitigating circumstances." (Order on remand, p. 3.)
The State has filed a supplemental brief on return to remand and notes that in its amended sentencing order the trial court has included an additional aggravating circumstance finding that it did not make in the original sentencing order  that Ziegler was under a sentence of imprisonment at the time of the crime. It is not entirely clear to this Court that the trial judge found an additional aggravating circumstance in its amended sentencing order that it did not find to exist in its original sentencing order. First, the trial court's failure to make specific factual findings in its sentencing order as to each aggravating circumstances and mitigating circumstance created an ambiguity that necessitated our remand for clarification of the trial court's findings. Second, evidence from the record suggests that the trial court might have found the aggravating circumstance in § 13A-5-49(1) to exist. The State introduced evidence demonstrating that Ziegler was on probation when he committed the kidnap-murder and it argued to the jury at the sentencing hearing that it had established the aggravating circumstance *151 that Ziegler was under a sentence of imprisonment. The trial court charged the jury that the State attempted to prove three aggravating circumstances, including the circumstance that Ziegler was "under sentence of imprisonment" when he committed the offense. In its original sentencing order, the trial court did not indicate that it found this aggravating circumstance, but it stated, "Although lack of a significant criminal history is not advanced as a mitigating circumstance, the Court notes that Defendant was on probation for a felony offense at the time of the murder and this circumstance does not exist." (C. 290.) Due to the ambiguity in the court's original sentencing order and the lack of complete findings as to each aggravating circumstance and mitigating circumstance, the cause was remanded for compliance with § 13A-5-47(d), Ala.Code 1975, so that each aggravating and mitigating circumstance could be addressed. In its amended order, the trial court stated with regard to the § 13A-5-49(1) aggravating circumstance, "This aggravating circumstance exists. As noted in the original sentencing order Defendant was at the time of the commission of the capital offense, on probation for Receiving Stolen Property First Degree." (Order on remand, p. 1.) Because it appears that the trial court did not find an "additional" aggravating circumstance, as the State suggests, no further discussion regarding the ambiguity created by the trial court's initial lack of compliance with § 13A-5-47(d), Ala.Code 1975, is necessary. The sentencing order[1] before us fully complies with the statute, and we can proceed with our review of the sentence.

II.
While this case was pending on review, the United States Supreme Court decided Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which potentially impacted sentencing proceedings in death-penalty cases in Alabama. The Supreme Court in Ring applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that "[c]apital defendants ... are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment." Ring, 536 U.S. at 589, 122 S.Ct. 2428. We asked the parties to address whether Ring impacted Ziegler's death sentence, and the parties filed supplemental briefs with this Court.
Ziegler argued that the jury's 11-1 recommendation that the death sentence be imposed violated Apprendi and Ring, and that the determination to impose the death sentence had to be unanimous and had to be made by the jury and not the judge. Ziegler's arguments have been decided adversely to him by the Alabama Supreme Court in Ex parte Waldrop, 859 So.2d 1181, 1188 (Ala.2002):
"Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, *152 Ala.Code 1975, § 13A-5-49(4), was `proven beyond a reasonable doubt.' Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Waldrop's case, the jury, and not the trial judge, determined the existence of the `aggravating circumstance necessary for imposition of the death penalty.' Ring, 536 U.S. at 585, 122 S.Ct. at 2443. Therefore, the findings reflected in the jury's verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi require."
The jury here convicted Ziegler of a murder made capital because it was committed during the course of a kidnapping; therefore, each juror necessarily found beyond a reasonable doubt that the aggravating circumstance in § 13A-5-49(4) existed. Upon conviction of the kidnap-murder of Russell Baker, Ziegler was exposed to the death sentence. The fact that the trial court found additional aggravating circumstances did not violate the principles of Ring or Apprendi.

III.
In accordance with Rule 45A, Ala. R.App. P., we have examined the record for any plain error with respect to Ziegler's capital-murder conviction and death sentence, and we have found no plain error or defect that has, or probably has, adversely affected any substantial right of Ziegler's.
We have also reviewed Ziegler's death sentence in accordance with § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Ziegler's capital-murder conviction, we shall also review the propriety of the death sentence. This statutory review includes our determination of the following: (1) whether any error adversely affecting Ziegler's rights occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating circumstances and the mitigating circumstances were supported by the evidence; and (3) whether the death sentence is proper in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must consider: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating circumstances and the mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. After the jury convicted Ziegler of this kidnap-murder, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances and after being properly instructed by the trial court as to the applicable law, the jury recommended a sentence of death by a vote of 11-1.
The trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether a death sentence as recommended by the jury was proper or whether Ziegler should be sentenced to life imprisonment without parole. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b), Ala.Code 1975. In its sentencing order, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975; each *153 mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975; nonstatutory mitigating circumstances as provided in § 13A-5-52, Ala.Code 1975; and written findings of fact summarizing the offense and Ziegler's participation in it. We have discussed the court's fact-findings in Part I of this opinion.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Ziegler to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence. We find no plain error or defect in the sentencing phase of the proceedings.
Ziegler was convicted of the offense of murder committed during the course of a kidnapping. This offense is defined by statute as a capital offense. See § 13A-5-40(a)(1), Ala.Code 1975. Similar crimes have been punished capitally throughout the State. Smith v. State, 838 So.2d 413 (Ala.Crim.App.2002); Ex parte Broadnax, 825 So.2d 233 (Ala.2001); Ex parte Grayson, 824 So.2d 844 (Ala.2001).
After carefully reviewing the record, as we are required by § 13A-5-53(b), Ala.Code 1975, to do, we have found no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. The trial court's findings are fully supported by the evidence presented. We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, and we believe that the trial court correctly determined that the aggravating circumstances outweigh the mitigating circumstances, and we agree that death is the appropriate sentence in this case. We find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Having complied with our statutorily mandated review of the proceedings below, including review for plain error, and having reviewed the imposition of the death sentence, we have concluded that Ziegler's death sentence is due to be, and is now, affirmed.
AFFIRMED AS TO SENTENCE.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.
NOTES
[1] State's Exhibit 29, the transcript of Ziegler's statement, was admitted at trial and is contained in the Supplemental Record, which is designated in this opinion as "Supp. R. ___."
[2] Although the witness identified herself as Ziegler's mother, she testified that Ziegler was actually her nephew and that she had raised him.
[3] In Issue II of his brief, Ziegler objects only to the lack of an instruction on Randall's accomplice testimony. The State, however, addresses the claim with regard to William Randall and Patricia Davis as accomplices.
[4] In Issue III, Ziegler acknowledges that Davis is an accomplice, but states that she testified that Ziegler told her that the victim had walked home. (Appellant's brief at p. 59.) Therefore, Ziegler argues only that, without William Randall's accomplice testimony, the evidence to convict him was insufficient to sustain his conviction.
[5] Although Ziegler does not argue that Davis's accomplice testimony should be eliminated, we disagree. Davis clearly was an accomplice because she could have been indicted and convicted for the offense charged, as a principal or as an accessory. Wright v. State, 494 So.2d 726, 738-39 (Ala.Crim.App.1985).
[6] The transcript of the sentencing hearing before the jury is designated as (S.R. ___.)
[7] We encourage trial courts to use the Alabama Pattern Jury Instructions-Criminal adopted by the Alabama Supreme Court for use in capital cases.
[1] Although the trial court's order is styled "Amended Sentencing Order," it is actually more in the form of a supplement to the original sentencing order because it addresses only aggravating circumstances and mitigating circumstances. Therefore, we consider the sentencing order submitted on remand as a substitute for the section in the original order that addresses the aggravating- and mitigating-circumstance findings. The order on remand and the remaining portions of the original order thus constitute the entire sentencing order in this case, and it is that entire order that we review.