[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 880 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 881 
James Donald Yeomans was convicted of four counts of capital murder following the beating and shooting deaths of his wife, Julie Ann Yeomans, and her parents, Jake and Sylvia Simmons; he was sentenced to death. This appeal followed. We remand with directions for further proceedings.
On January 20, 2000, James Donald Yeomans was indicted for four counts of capital murder for the November 22, 1999, deaths of his wife and her parents. Specifically, he was charged with three counts of capital murder under § 13A-5-40(a)(10), Ala. Code 1975, for killing two or more persons during one course of conduct. He was also charged with one count of murder during the course of a robbery, § 13A-5-40(a)(2), Ala. Code 1975, for killing Julie Ann Yeomans during the course of the theft of her purse and its contents, while using force against Julie and/or her parents. Yeomans pleaded not guilty and not guilty by reason of mental disease or defect. Pursuant to defense motions that were granted by the trial court, two mental-health experts conducted psychological evaluations of Yeomans. After a jury trial, which began on March 26, 2001, Yeomans was convicted of all four counts of capital murder. The jury then recommended, by a vote of 11-1, that the death sentence be imposed. On July 18, 2001, following a separate sentencing hearing, the judge adjudicated Yeomans guilty of four counts of capital murder and imposed the death sentence as to each count. Yeomans filed a motion styled "Motion for Judgment of Acquittal Notwithstanding the Verdict" and a motion for a new trial. Those motions were denied.[2]
Jody Simmons, the 21-year-old son of victims Jake and Sylvia Simmons and the sister of victim Julie Yeomans,[3]
testified that in November 1999, when the murders occurred, he was 20 years old and was living at home with his parents. He left the house at 6:30 a.m. on the day of the murders, a Monday, leaving his parents, Julie, and her three children in the kitchen. Julie and the children had spent the previous night with their parents, he said. He returned home at 11:30 a.m. to have lunch, and he noticed that a window on his mother's automobile had been broken. When he entered through the back door of the house he immediately noticed that a shotgun, which was usually kept in a bedroom closet, was lying across a chair in the den near the back door. As Jody walked into the house, he saw his mother's purse on the table, so he walked toward the living room to see whether anyone else was home. He then saw his mother just *Page 883 
inside the living room doorway, covered in blood. His father was on the living room floor, also covered in blood. Jody left the house and drove to the police station; he had not seen the body of his sister, Julie. He did not return to the house that day.
On cross-examination, Jody stated that Julie had been married to another man before she married Yeomans. She and her first husband had two children, Casey and Brandon. She and Yeomans had a daughter, Lee Ann, who was two years old at the time of the murders.
Baxter Etheridge testified that on the morning of the murders he traveled past the Simmons house between 7:30 and 8:00 a.m. As he passed by the house, he saw a young woman jump off a small porch and push a tall, slender man so hard that he was almost knocked down. Etheridge stated that after he drove for approximately one mile, he turned his vehicle around to drive past the house again to be sure that everything was all right. When he passed the house again, he saw the young woman standing beside a car; it appeared to him that she might have been crying. He did not see the tall, slender man or anyone else at that time. Etheridge testified that he turned his vehicle around again in order to continue in the direction he had originally been traveling that morning. When he passed by the Simmons house the third time, a few minutes after his second pass by the house, he did not see the woman standing by the car, but he saw someone in the doorway of the house. It appeared that the person was backing into the house and was pulling something into the house with him. Officer Keith Galloway of the Geneva Police Department testified that at 1:22 a.m., several hours before the murders, he saw Yeomans and his teenaged son walking on a rural road. Galloway stopped Yeomans to ask what he was doing out there at that time of night, and Yeomans told him he was going to see his brother-in-law to get a ride to work. Galloway thought his answer was odd, because he knew that Yeomans worked at Outdoor Aluminum, and Yeomans had already walked past that business by the time Galloway stopped him.
Marion Spivey testified that at approximately 7:00 a.m. on the day of the murders, he was driving a tractor on the road behind the Simmons house. He saw Jake and Sylvia Simmons and Julie and James Yeomans talking in the front yard. He saw a small child standing behind the adults. He did not see anyone pushing anyone else, and he did not hear anyone shouting.
Casey Rogers testified that he was nine years old and that his mother was Julie Yeomans. He was eight years old when his mother was killed, and that he had been living with his mother, his younger brother and sister, and James Yeomans. Yeomans's two sons, Alan and Donald, were also living with them. Casey said that Yeomans and his mother argued and fought on Saturday night before the murders. He did not know whether his mother hit Yeomans, but he thought "a couple of licks was passed." (R. 491.) Casey testified that his mother pulled a knife on Yeomans and told him that he had better stay away from her. Casey said that he thought that his mother was injured that night.
On Sunday morning, Casey's grandparents, Jake and Sylvia Simmons, came to the Yeomanses' residence. Casey said that he was playing with a triangle-shaped "football" made from a piece of notebook paper. Before Casey and his four-year-old brother, Brandon, left with their grandparents, Julie took Casey's paper football and told him that she wanted to write his name in it. When Casey got into his grandparent's car, he unfolded the paper football *Page 884 
because his mother often drew pictures for him on such occasions. This time, Julie had written him a note, Casey said. The note instructed Casey to say nothing to his grandparents about what had happened between her and Yeomans until they had left the yard. Sylvia Simmons took the note from Casey and put it in her purse.
After the Simmons left the Yeomanses' residence with Casey and Brandon, they drove to the police station. After the grandparents spoke to the police, they went to the Simmonses' residence. Sometime later, on Sunday evening, Julie arrived at her parents' home and she brought Lee Ann, Casey's younger half-sister, with her. Julie and the three children spent the night with the Simmonses.
Casey testified that all of the family members were awake and in the kitchen on Monday morning when his Uncle Jody went to work. Casey said that the rest of the family intended to enroll him in the local school that morning. Casey, Brandon, and Lee Ann were in the backseat of their grandparent's automobile, he said, and his mother and grandparents were coming outside to get into the car. Yeomans and his son, Alan, appeared from behind the carport. Yeomans told Julie that he wanted her and Lee Ann to come home with him. Casey said that his mother refused and she told Yeomans that "she was tired of being beaten on. . . ." (R. 502.) Yeomans then told Julie to get Lee Ann and her belongings and he would take her home. Casey said that Julie refused Yeomans's request, and the two argued and yelled.
Casey testified that his grandfather said he was going to get his shotgun and walked toward the house. Yeomans told Alan to block the door, and he did. Casey said that Alan and Jake "tied up and wrestled and fell down the stairs and stuff." (R. 503.) Casey said that, somehow, Yeomans got his mother and grandmother into the house. The three children had remained in the car during this time.
Casey and Brandon then got out of the car. At Casey's direction, the car doors were locked with Lee Ann inside. Casey explained, "I just wanted to keep her as safe as I could because I didn't think she wanted to see what was going to happen." (R. 504.) Casey and Brandon then ran toward the house. Jake and Alan were still wrestling in the yard.
When Casey entered the house, he saw his grandmother on floor. He knew she had been hurt because her glasses were broken and had fallen off and blood was "coming out of her face." (R. 505.) Casey asked where his mother was, and his grandmother pointed toward the hallway. Casey went to his mother, who was on the floor "with blood coming out of her head." (R. 506.) Casey hugged her and got blood on his shirt, he said. Yeomans told Casey and Brandon to sit on the couch, and they did. Casey said that he and Brandon were crying and that Brandon was screaming, so Yeomans told them, while brandishing a metal pipe, to shut up or they would be next. Casey had previously seen the metal pipe in his grandparents' front yard. Yeomans went outside, and Casey went to check on his mother. He asked Julie what had happened and she told Casey that Yeomans had hit her. Casey asked what Yeomans had hit her with, because he knew Yeomans could not have hit her that hard with his hand and because he had not seen Yeomans hit his mother. Julie did not answer Casey's questions, so he returned to the couch.
Casey testified that he saw Yeomans drag Jake Simmons by the hand up the porch stairs and into the house. He then saw Yeomans hit his grandfather on the head with the pipe. Casey said that he and Brandon remained on the couch while *Page 885 
his mother and grandparents were on the floor, beaten. His mother and grandparents were moaning and groaning, Casey said. Yeomans went to Casey's grandmother, said something like, "Shut up, you bitch," and pushed her with his foot.
Yeomans told Alan to go outside to get Lee Ann out of the car, which he did. Casey testified that Yeomans then checked Jake's shotgun and found that it was not loaded. Yeomans then went to Jody's room and retrieved the .22-caliber rifle Jody kept there. Yeomans told Alan to take Lee Ann and the boys to another room and to keep them there. Casey saw Yeomans go into the living room and he heard at least three gunshots. Yeomans then told the children to get into their mother's car. Casey identified his mother's purse and said that Yeomans took it with them when they left the crime scene.
Yeomans drove with the four children to his sister's house in Florida. When a police officer arrived at the sister's house, Casey told him that two black men had broken in and killed his mother and his grandparents and that Yeomans had knocked the men out and saved the children. Casey testified that Yeomans told him to tell the police that story. Casey said he did as Yeomans instructed because Yeomans also said that if Casey and Brandon told the truth instead, he would kill them. On cross-examination, defense counsel asked Casey if, during the drive to Florida, he, not Yeomans, had concocted the story about the two black men killing his mother and grandparents. Casey denied that he had done so and stated, "I didn't say a whole word the whole time we were riding up there. I was too scared to speak. I was afraid I would say the wrong thing and I would get killed. That's what I was afraid of." (R. 523.) Tommy Merritt, an agent with the Alabama Bureau of Investigation, testified that he traveled to the Simmonses' home at approximately 1:00 p.m. on the day of the murders. He identified photographs of the crime scene that were taken before the victims' bodies were removed from the residence. He also identified a diagram of the crime scene that he drew that day.
Merritt testified that the window on the passenger side of the car in the Simmonses' yard had been shattered. A large pipe wrench was on the floorboard of the driver's side of the car, which suggested to Agent Merritt that the wrench had been thrown in to break the window. He said that several items were recovered close to the front door of the house, including a shotgun shell, a man's shoe, and a baseball cap. Jake Simmons was wearing only one shoe when his body was recovered inside the home.
Merritt stated that a loaded shotgun was found on a chair near the back door of the house and that a .22-caliber rifle was found in a hallway between the living room and a bedroom. The rifle was near the body of Julie Yeomans. Agent Merritt also said that a metal pipe approximately 2 to 2 1/2 feet long was found on top of an old stove in the dining area. The pipe was stained with what appeared to be blood. Several spent shell casings and bullets from a .22-caliber rifle were found inside the home.
Agent Merritt testified that Jake and Sylvia Simmons and Julie Yeomans had obvious wounds to their heads and that they had bled profusely from the wounds. He testified that each victim appeared to have been shot. A dead dog was also discovered near the victims. Like the human victims, the dog was lying in a pool of blood. A videotape of the crime scene was played for the jury.
Dr. Alfredo Parades, a forensic pathologist, conducted autopsies on Jake and Sylvia Simmons and on Julie Yeomans. He *Page 886 
testified that Jake Simmons suffered multiple blunt-force injuries to his face and to the top and back of his head. The left side of Jake's face was "partially collapsed" as a result of the extensive fracturing of the bones of the face. Jake suffered defensive wounds to his right hand, and he was also shot through the face and the brain with at least one bullet. Dr. Parades testified that the bruising around the injuries indicated that Jake was alive when all of the injuries were inflicted. Dr. Parades stated that Sylvia Simmons suffered multiple cuts and fractures to her head and skull, and she suffered much bleeding and bruising inside her brain as a result of the injuries. Dr. Parades stated that Sylvia was struck at least 10 times on the head. Sylvia was alive when at least some of the head injuries were inflicted. She also sustained a gunshot wound that entered her right cheek, then traveled up and back, lodging in the left side of her brain. Sylvia was struck by "a massive blow" on the left wrist with that caused a fracture and deformity of both bones of the wrist. Dr. Parades stated that the injuries to the wrist were defensive wounds and that they were consistent with the width of the metal pipe recovered from the scene. The back of Sylvia's right hand and her right arm and wrist also sustained defensive wounds. The cause of Sylvia's death was blunt-force injuries to the head and a gunshot wound to the face.
Julie Ann Yeomans was beaten on the head and she was shot repeatedly. Dr. Parades testified that one of the bullets entered the right side of her neck, then traveled downward and exited the back of Julie's central chest area. Another of the bullets grazed her face and passed through her earlobe; another bullet entered through her right temple area; another bullet entered through her right cheek. Two of the bullets left fragments in Julie's brain. Julie was also shot through her right eye and through her mouth. Dr. Parades opined that Julie was alive each time she was shot, because bruising was visible around the entrance wounds. Dr. Parades stated that Julie died as the result of the multiple gunshot wounds to the face and neck and as a result of the multiple blows to the top and side of her head.
Dr. Parades performed an autopsy on the dog that was found dead at the scene. The dog was shot in the chest; the bullet penetrated the lungs and the aorta, and the dog bled to death internally.
Charles Richards, a laboratory analyst with the Florida Department of Law Enforcement, testified that he examined the vehicle Yeomans had driven to Florida. In the trunk of the car he found a purse that Casey had identified as belonging to his mother.
Michael D'Errico,[4] a clinical and forensic psychologist, conducted a court-ordered evaluation of Yeomans. He reviewed school records and investigative reports regarding the murders, and he interviewed and examined Yeomans. D'Errico testified that Yeomans is not mentally retarded and that his actions at the time of the offense were unrelated to any severe mental illness or defect.
Deputy Sheriff Tony Wasden of the Okaloosa, Florida, sheriff's department testified that on the afternoon of the murders, Yeoman's sister, who was an acquaintance of Wasden's, requested that he come to her residence. Soon after he arrived at the sister's residence, Wasden placed Yeomans in his patrol car and advised him of *Page 887 
his Miranda[5] rights. Wasden and a police investigator interviewed Yeomans at the police station. Yeomans told the police that he had hitchhiked to the Simmonses' house in search of his wife. He said that when he arrived at the house, the door was open, the dog was barking, and Casey and Brandon were jumping up and down on the couch, hollering and crying. Yeomans said he discovered the victims in pools of blood on the floor, and he said that Casey told him that two black males had killed his grandparents and his mother.
Tommy Merritt of the Alabama Bureau of Investigation testified that he and two other law-enforcement officers traveled to Florida on the night of the murders after Yeomans was taken into custody to interview Yeomans. During the interview, Yeomans initially denied any knowledge of the murders, then he told the officers that he had some information but that he had blacked out and did not remember anything that occurred after he approached his wife and her parents that day. Eventually, Yeomans admitted he had committed the crimes, and he gave a taped statement. The tape recording was played for the jury.
After the State rested its case, defense counsel made a motion to dismiss the charges, which the trial court denied.
Tammy Baxter, who had previously been married to Yeomans for 10 years, testified that Yeomans was a good, kind man, but that he was not smart and that he could neither read nor write. She stated that Yeomans had been a good father to their children and had taught them right from wrong.
Yeomans' sister, Tammy Kennedy, testified that their father was physically abusive to their mother and to all of the children. She said that Yeomans could not read or write well, but that he was a good father to his children and that he was not a violent man. Kennedy testified that when Yeomans came to her house on the day of the murders, he told her that two men had killed the victims.
Alan Yeomans, one of the appellant's sons, also testified at trial. He testified that, at the time of the murders, he was living at home with his father, Julie, Lee Ann, Brandon, and Casey. On the Sunday before the murders, Yeomans and Julie got into an argument and Julie pulled a knife on Yeomans, Alan said. Julie and Lee Ann went to her parents' house; Brandon and Casey were already at the Simmonses' house. Late Sunday evening, Yeomans asked Alan if he wanted to walk with him to get Lee Ann. Alan said they hitched a ride with a truck driver and they walked the remainder of the distance of 20 or more miles to the Simmonses' house. They waited in the abandoned house next door because they arrived early in the morning. After they saw the children in the car, Alan said, they walked over and Yeomans asked Julie if he could have Lee Ann. Julie refused.
Alan testified that an argument among his father, Julie, and Sylvia then began. Sylvia yelled to Yeomans that he could not have Lee Ann and that he could not even touch her. Jake went inside to get a gun, which he then propped against the frame of the front door, and he came outside. Julie and Sylvia pushed Yeomans on the chest and hit him in the face, Alan said, and Jake ran toward the house to get his gun. Alan said that he grabbed Jake and pinned him against the wall, then wrestled with him on the porch. Julie knocked them off the porch as she attempted to retrieve the gun, he said. He said that Julie and Sylvia and his father ended up *Page 888 
inside the house, then Yeomans came outside and pulled Jake into the house. Alan went outside and broke a car window to get Lee Ann out of the locked car. Alan said that he took Lee Ann to a back room of the house, and took the rifle and threw it into a bedroom so that it would not be used. He said he knew "they were all in there fighting." (R. 654.) Alan said he did not see Yeomans beat anyone, but he did see his father kick Sylvia in the head. She was on the floor moaning and had already been beaten in the head, Alan said. Later, Yeomans handed Julie's purse to Alan and told Alan to take the children to the car. They left the scene in Julie's car and drove to Florida. Alan testified that he did not remember telling the police, "He (Yeomans) just said that he was going out there to get the baby and we might have to take them out to do it." (R. 673.)
Clint Yeomans testified that his biological father was Lewis Yeomans, but that James Yeomans had raised him and he considered James Yeomans to be his father. Clint said that Yeomans was a good father who tried to teach the children right from wrong.
Wynton Melton testified for the defense. He stated that he was a retired school administrator and that he was familiar with Yeomans and his family. Melton testified that Yeomans had been in the special education curriculum in school. He stated that he had perceived that Yeomans's home situation was volatile and abusive. Melton testified that Yeomans engaged in some verbal abuse in school but that he had not been physically violent. Yeomans quit school during the twelfth grade.
Penny Drake, Yeomans's older sister, testified about their abusive father and stated that Yeomans had attended special education classes.
Wayne Lewis Yeomans, the appellant's brother, testified that he had lived next door to Yeomans and Julie for several years. He said that he had seen them fight but that they seemed to be getting along well during the weekend before Julie moved out.
After the evidence was presented, the attorneys made their closing arguments and the judge charged the jury. The jury found Yeomans guilty of each of the capital murder charges.
At the sentencing hearing before the jury, Yeomans presented the testimony of Donald Weeks, a jailer at the Geneva County jail, who stated that Yeomans had "given his life over to the Lord." Weeks said that Yeomans had admitted that what he did was wrong and that he was "ready to answer for that." (R. 780.) He testified that he believed that Yeomans was sincere in his beliefs.
Two ministers who had met with Yeomans during his incarceration on these charges testified that Yeomans knew that what he had done was wrong and that he had expressed remorse for his actions. The ministers testified that Yeomans could share his religious knowledge with other inmates if he received a sentence of life imprisonment without parole.
After the attorneys presented closing arguments and the court charged the jury, the jury recommended, by a vote of 11-1, that Yeomans receive the death sentence.
On July 18, 2001, the trial court held a separate sentencing hearing. No evidence was presented at this hearing. The court heard the arguments of counsel and then issued its order imposing the death sentence. On August 17, 2001, Yeomans filed posttrial motions seeking to set aside the verdict; the motions were denied.
 I.
Rule 45A, Ala. R.App. P., provides: *Page 889 
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Plain error has been defined as error so obvious that the failure to notice it would seriously affect the fairness or the integrity of judicial proceedings. Plain-error review of an alleged error must be conducted within the context of the entire proceeding. E.g., Turner v. State, [Ms. CR-99-1568, Nov. 22, 2002] ___ So.2d ___, ___ (Ala.Crim.App. 2002). Alabama courts have often stated that a defendant's failure to object to an alleged error at trial weighs against any claim of prejudice raised on appeal. E.g., Ziegler v. State, 886 So.2d 127
(Ala.Crim.App. 2003), Ex parte Kennedy, 472 So.2d 1106, 1111
(Ala. 1985). Lastly, the United States Supreme Court has often stated that a criminal defendant is constitutionally entitled to a fair trial, not to a perfect one. E.g., United States v.Hasting, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983);Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431,89 L.Ed.2d 674 (1986).
In its brief to this Court, the State raises an issue for us to review for plain error even though the issue was not raised by Yeomans at trial or on appeal. The State correctly notes that Yeomans was convicted of four counts of capital murder: one count of robbery-murder and three counts of murder of two or more persons pursuant to one scheme or course of conduct. Recognizing that the convictions on the latter three indictments implicate double-jeopardy principles, the State addresses the issue and argues that the principles of double jeopardy were not violated. We agree that double-jeopardy principles are implicated here by the convictions of three counts of capital murder for the murder of two or more persons pursuant to one scheme or course of conduct. We further find that these double-jeopardy principles were violated and that a remand is required.
The incident giving rise to these charges involved the murder of three people and resulted in four separate indictments. The indictment in case no. CC-2000-42 charged that Yeomans did, by one act or pursuant to one scheme or course of conduct, intentionally cause the death of Jake Simmons by blunt-force trauma and/or gunshot wound, and that he also caused the deaths of Julie Ann Yeomans and Sylvia Simmons. The indictment in case no. CC-2000-43 charged that Yeomans did, pursuant to one act or scheme or course of conduct, intentionally cause the death ofSylvia Simmons by gunshot wound and/or blunt-force trauma, and that he also caused the deaths of Julie Ann Yeomans and Jake Simmons. The indictment in case no. CC-2000-44 charged that Yeomans did, pursuant to one scheme or course of conduct intentionally cause the death of Julie Ann Yeomans by gunshot wound and/or blunt-force trauma, and that he also caused the deaths of Jake Simmons and Sylvia Simmons. The indictment in case no. CC-2000-58 charged that Yeomans intentionally caused the death of Julie Ann Yeomans by blunt-force trauma and/or gunshot wound during the course of committing the robbery of Julie Ann Yeomans's purse.
Yeomans was tried on the charges in the four indictments; the four charges were submitted to the jury; the jury returned verdicts as to each of the four charges; at the penalty phase, the jury returned sentencing verdicts as to each of the four *Page 890 
charges; following a separate sentence hearing, the trial court entered an order finding Yeomans guilty of four counts of capital murder.
The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., Amend. V. The United States Supreme Court has discussed the constitutional principles regarding the prohibition against double jeopardy quite simply:
 "In both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the `same-elements' test, the double jeopardy bar applies. See, e.g., Brown v. Ohio, 432 U.S. 161, 168-169, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306, (1932) (multiple punishment); Gavieres v. United States, 220 U.S. 338, 342, 31 S.Ct. 421, 55 L.Ed. 489 (1911) (successive prosecutions). The same-elements test, sometimes referred to as the `Blockburger' test, inquires whether each offense contains an element not contained in the other; if not, they are the `same offence' and double jeopardy bars additional punishment and successive prosecution."
United States v. Dixon, 509 U.S. 688, 696, 113 S.Ct. 2849,125 L.Ed.2d 556 (1993).
The three indictments charging Yeomans with the murder of two or more persons pursuant to one scheme or course of conduct were alternative methods of charging the same offense. The only variation in the three indictments was the order in which the victims' names were listed. The same elements established each of the three charges; none of the three offenses contained an element not also required for the other two offenses. Therefore, convictions on these counts violated double jeopardy principles, and the convictions on the three separate counts of capital murder pursuant to § 13A-5-40(a)(10), Ala. Code 1975, cannot stand. See Wynn v. State, 804 So.2d 1122, 1150 (Ala.Crim.App. 2000); Stewart v. State, 601 So.2d 491, 494-95 (Ala.Crim.App. 1992), aff'd in part, rev'd in part on other grounds,659 So.2d 122 (Ala. 1993), aff'd, 730 So.2d 1246 (Ala. 1999). Accordingly, we remand this case to the trial court with instructions that it vacate two of the appellant's convictions for capital murder under § 13A-5-40(a)(10), Ala. Code 1975. The conviction for robbery-murder, § 13A-5-40(a)(2), Ala. Code 1975, which is not implicated by double-jeopardy principles, is not affected by this order of remand and can stand. Wynn v. State,804 So.2d at 1150.
 II.
In Issue I of his brief,[6] Yeomans presents several disparate arguments under the issue statement alleging that the prosecution's "consolidation of capital murder and theft charges" violated constitutional principles. As best we can discern, Yeomans makes the following claims: that the record does not indicate that he was given an opportunity to be heard on the joinder of the four charges against him; that the capital-murder and theft charges should not have been joined; and that the State failed to prove the robbery component of the robbery-murder charge, § 13A-5-40(a)(2), Ala. Code 1975, because there was no taking of property during the killing.[7] *Page 891 
Yeomans is not entitled to relief on any of these claims.
A. Consolidation and an opportunity to be heard.
Yeomans states that there is no indication in the record that he was given an adequate opportunity to be heard on the consolidation of the four offenses for trial.[8] This claim is being raised for the first time, so we review it for plain error. We find no error, plain or otherwise, with regard to the consolidation of the charges for trial.
Rule 13.3, Ala. R.Crim. P., permits the consolidation of two or more offenses if the offenses are based on the same conduct or if they were part of a common plan or scheme. Rule 13.3(c) states that the court, on its own initiative, may order the offenses to be tried together. Rule 13.3(c) also states that offenses shall not be tried together until the defendant and the prosecutor are provided with "an opportunity to be heard." The record does not indicate that the State filed a motion to consolidate the separate indictments for trial. Yeomans was initially arrested in November 1999 on three counts of capital murder for the murder of two or more persons pursuant to one scheme or course of conduct, DC-99-1069, DC-99-1070, and DC-99-1071. One week after Yeomans's arrest, defense counsel filed several motions on Yeomans' behalf. Defense counsel included on each motion all three of the case numbers that had been assigned at that time. The trial court's rulings on those defense motions also referenced the three case numbers. Approximately two months after Yeomans was arrested on the initial charges, he was indicted on an additional charge of capital murder arising out of the theft of Julie's purse during the course of a murder. Thereafter, in all of his motions in this case, defense counsel included the case numbers for each of the four charges of capital murder. The trial court's numerous pretrial orders likewise referenced the four case numbers. Ultimately, on March 27, 2001, the case proceeded to trial on the charges in the four indictments. Yeomans did not object to the consolidation until he raised this claim on appeal.
In Neville v. State, 832 So.2d 669, 670 (Ala.Crim.App. 2001), we stated that this Court had previously held "that the `opportunity to be heard' includes notice and the opportunity to object, but does not necessarily require an adversarial hearing or oral argument. Sharpe v. State, 560 So.2d 1107
(Ala.Crim.App. 1989)." Yeomans clearly had the opportunity to object to the consolidation and to be heard on any objection he might have had. The record reflects, however, the defense counsel and the trial judge immediately began acting as if the charges had been consolidated. Therefore, based on the record before us, we find that no error or plain error occurred with regard to the consolidation of the charges for trial.
Moreover, although Yeomans does not appear to argue that he did not receive notice of the consolidation, we note the following. As set forth in the discussion above, the record indicates that defense counsel and the trial court had continuously treated the cases as consolidated, beginning *Page 892 
with defense counsel's filing of motions days after Yeomans was arrested on the three initial charges and continuing after the fourth charge, the robbery-murder charge, was filed. Clearly, Yeomans received notice that the charges were to be tried together. See Tolliver v. State, 814 So.2d 991, 994
(Ala.Crim.App. 2000).
In summary, Yeomans is not entitled to any relief on this claim. Yeomans was provided with the opportunity to be heard. No plain error occurred.
B. Consolidation of capital murder and theft charges.
Yeomans's main argument in this portion of his brief is that the capital-murder charge and the theft charge should not have been consolidated.[9] This claim is reviewed for plain error, because it was not raised in the court below.
Yeomans was charged under § 13A-5-40(a)(10), Ala. Code 1975, with three counts of capital murder for the murder of two or more people pursuant to one scheme or course of conduct. He was also charged with murder made capital because it occurred during the course of a robbery, § 13A-5-40(a)(2), Ala. Code 1975. The State did not file a separate charge of theft. Therefore, there was no improper consolidation, or any consolidation at all. As to the theft of Julie's purse, the State filed a single charge of robbery-murder, § 13A-5-40(a)(2), Ala. Code 1975, which included allegations that a murder occurred during the course of the theft of the purse. This was but a single offense. There being no joinder of the capital-murder and theft charges, Yeomans's allegation of error necessarily fails, and he is not entitled to any relief on his claim.
C. Proof of robbery charge.
Yeomans also argues in this issue that the robbery-murder conviction cannot stand because the State failed to establish the robbery component of the charge. Specifically, he alleges that there was no proof that he intended to commit a theft or that he took Julie's purse; he further argues that, even if the purse was taken, the theft occurred after Julie was dead. None of Yeomans's claims, however, entitle him to relief.
This Court has consistently held that it will not reweigh the evidence presented at trial and that the credibility of evidence presented and the weight and probative force of that evidence are matters for the jury to determine. E.g., Kabat v. State,867 So.2d 1153 (Ala.Crim.App. 2003).
To establish a prima facie case of robbery-murder under §13A-5-40(a)(2), Ala. Code 1975, the State must prove a robbery in the first degree or an attempt thereof, as defined by § 13A-8-41, and a murder as defined by § 13A-6-2(a)(1), Ala. Code 1975. The State must also establish that the murder was committed during the robbery or attempted robbery. "During" is defined in the capital-murder statute to mean "in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof." §13A-5-39(2), Ala. Code 1975.
To the extent Yeomans argues that the conviction must be reversed because the purse was taken, if at all, after Julie died, this claim fails. The statute requires that the intentional murder occur during the course of the robbery, but the taking of the property need not occur while the victim is alive. E.g.,Duncan v. State, 827 So.2d 838, 844 (Ala.Crim.App. 1999). As for Yeomans's claim that his sole intent *Page 893 
when he went to Jake Simmons's house was to obtain custody of his daughter and that he had no intent to take any property, we note that intent is a question left for the jury to decide. E.g.,Lewis v. State, 889 So.2d 623, 681 (Ala.Crim.App. 2003). Moreover, we have stated, "`"The defendant's intent to rob the victim can be inferred where `[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events.' Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984)."'" Duncan,827 So.2d at 844. (quoting Hallford v. State, 548 So.2d 526, 534-35
(Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala. 1989)).
The evidence here was more than sufficient to permit the jury to determine that Yeomans committed a murder during the course of a robbery. Julie's son, Casey, testified that Yeomans took Julie's purse with them when he drove them to Florida. (R. 518.) Alan Yeomans, the appellant's son who walked with Yeomans to the Simmonses' house, testified that, immediately after Yeomans killed the victims, he told Alan to get the keys to Julie's car. Alan said that the keys were in Julie's purse and that the purse was in the car with them when they left the scene and traveled to Florida. (R. 665-66.) Alan also testified that Yeomans handed the purse to him and told him to put it in the car. In the tape recorded statement he made to an investigator, Yeomans admitted that he and Alan took Julie's purse with them when they drove to Florida. (R. 588.) Charles Richards, a lab analyst with the Florida Department of Law Enforcement, testified that, from the trunk of the vehicle Yeomans drove to Florida after the murders, he recovered a purse with at least one item that had the name "Julie" on it. (R. 538-41.) The jury had before it ample evidence from which it could reasonably conclude that Yeomans committed a robbery. Therefore, we reject his claim that the robbery-murder conviction must be reversed.
 III.
In Issue II of his brief, Yeomans argues that the State failed to establish a complete chain of custody for Julie's purse. Specifically, he argues that the evidence failed to establish who put the purse in the car in which he and the children traveled to Florida. Yeomans did not object at trial to the allegedly inadequate chain of custody, so this claim is reviewed only for plain error. No plain error exists as to this claim, and Yeomans is entitled to no relief.
To the extent Yeomans contends that reversal of the robbery-murder conviction is due because the State failed to prove that he put Julie's purse in the car he drove to Florida, he misapprehends the law regarding proof of the chain of custody. The identity of the person who placed the purse in the car is not relevant to the chain of custody.
 "Proper analysis of a chain of custody question, however, does not begin at the time of the offense; the chain of custody begins when [an] item of evidence is seized by the State. State v. Conrad, 241 Mont. 1, 785 P.2d 185 (1990); 29A Am.Jur.2d, Evidence § 947 (1994 ed.) (`The chain-of-custody rule does not require the prosecution to account for the possession of evidence before it comes into their hands.') Anyone who has handled evidence in the State's possession is a `link' in the chain of custody; once the evidence is in the State's possession, it is the State's duty to account for each link. § 12-21-13, Code of Alabama (1975). See, Ex parte Holton, 590 So.2d 918, 920 (Ala. 1991)." *Page 894 
Burrell v. State, 689 So.2d 992, 995-96 (Ala.Crim.App. 1996).
Therefore, in order to establish the chain of custody for Julie's purse, the State did not have to account for the identity of the person who actually put the purse into the car. There was no evidence suggesting that the purse recovered from the car Yeomans drove to Florida was not Julie's, and Yeomans does not make that claim. Law-enforcement authorities ultimately recovered the purse and processed it along with other evidence in the case. Yeomans makes no claims regarding the chain of custody of the purse once it was in the State's possession. Therefore, his allegation regarding an improper chain of custody must fail.
 IV.
In Issues III and IV of his brief, Yeomans argues that the trial court erred in admitting certain pieces of evidence because they were irrelevant to the case. Specifically, he claims that the following exhibits should not have been admitted: State's Exhibit 5, a crime-scene diagram; State's Exhibit 9, a shotgun; State's Exhibit 17, bullets; and State's Exhibits 6A-6Z, photographs of the crime scene and the victims. As best we can discern, it appears that Yeomans also argues that the photographs should not have been admitted because they were prejudicial and inflammatory. At trial, Yeomans did not object on relevancy grounds to any of the evidence he now argues was improperly admitted. He objected to seven of the photographs, State's Exhibits 6D, 6G, 6H, 6M, 6W, 6X, and 6Y, on grounds that they were grotesque and inflammatory and that they were cumulative of other photographs. (R. 364.) Yeomans did not object to those photographs on grounds of relevancy. Therefore, Yeomans's argument to this Court that all of the items of evidence now objected to should have been precluded on relevancy grounds was not raised in the trial court and is subject to review only for plain error. To the extent that Yeomans argues to this Court that the photographs were inflammatory and prejudicial, that claim is reviewed only for plain error except as to State's Exhibits 6D, 6G, 6H, 6M, 6W, 6X, and 6Y.
A. Crime scene diagram.
Yeomans argues that State's Exhibit 5, a crime scene diagram (C. 109), should not have been admitted because it did not have "anything to do with this crime." (Appellant's brief at p. 22.) We disagree.
Alabama courts have repeatedly held that the trial court has broad discretion in determining the admissibility of evidence, and that the trial court's determination will not be reversed unless the court has abused its discretion. E.g., Gavin v.State, 891 So.2d 907, 963 (Ala.Crim.App. 2003). Rule 402, Ala. R. Evid., states that all relevant evidence is admissible, unless otherwise precluded by law. Rule 401, Ala. R. Evid., defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." As with the determination of admissibility, trial courts have broad discretion in determining whether evidence is relevant, and a court's determination will not be reversed unless the decision constituted an abuse of discretion. Gavin at 963.
"The use of diagrams for the purpose of illustrating testimony is within the sound discretion of the trial judge." Spurgeon v.State, 560 So.2d 1116, 1123 (Ala.Crim.App. 1989). See alsoWagner v. State, 489 So.2d 623, 625 (Ala.Crim.App. 1985). The crime scene in this case was complex: multiple victims had been murdered *Page 895 
and many items of evidence, including the metal pipe, the rifle, bullets, and shell casings were recovered at the scene. The location of the rooms in the house was relevant to the testimony of the eyewitnesses, who testified as to their movements inside and outside the house during the time Yeomans bludgeoned and shot the three victims.
The diagram was certainly relevant, and the trial court did not abuse its discretion in admitting the diagram of the crime scene into evidence. No plain error occurred. We note, furthermore, that during his cross-examination of Agent Merritt, defense counsel offered into evidence Exhibit 1, a rough drawing of the crime scene that was sketched by Merritt. (R. 439-40; C. 151.) Defense counsel also asked questions about the location of the bodies and the guns found at the scene. Thus it appears that, even at trial, Yeomans found the crime-scene diagram to be relevant and admissible evidence. Any claim to the contrary on appeal is meritless and must be rejected.
B. Shotgun.
Yeomans argues that State's Exhibit 9, the 12-gauge shotgun, was irrelevant and should not have been admitted. He did not raise this objection at trial, so the claim is reviewed for plain error. Evidence of the objects found during the investigation of the crime scene within a reasonable time after the commission of the crime is always admissible. Ex parte Scott, 728 So.2d 172,188 (Ala. 1998).
We find no plain error in the admission of the shotgun.
Yeomans argues that:
 "[T]he shotgun had no bearing whatsoever on the alleged crime. The shotgun as shown by the diagram [State's Exhibit 5] was placed across a chair in the kitchen.[10] Now, it could have been placed there by Mr. Simmons for the purpose of using it on Mr. Yeomans, but it never became a part of the crime scene, and therefore, introduction of it was done for nothing more than to inflame the jury by introducing another gun such as a 12 gauge shotgun."
(Appellant's brief at p. 21.)
Yeomans thus acknowledges that the shotgun was, in fact, a part of the crime scene and that it was depicted in the crime scene diagram introduced by the State. He further suggests that the weapon might have been placed there by one of the victims. His own argument in his brief to this Court indicates that the shotgun was a relevant piece of evidence because it was evidence that remained after the victims were murdered. Furthermore, some of the witnesses at trial testified about the shotgun and its placement on the chair. Jody Simmons testified that when he returned home on the day of the murders, he immediately saw the shotgun on the chair in the den. He said that the shotgun was out of place, and that it was usually kept in a bedroom in his parents' house. (R. 305.) Casey testified that his grandfather had intended to get the shotgun during the early part of the melee, but that, upon Yeomans's order, Alan had prevented Jake from entering the house. (R. 503.) Casey further testified that he saw Yeomans with the shotgun after the victims had been beaten with the metal pipe.
Yeomans's belatedly raised claim that the shotgun "had no bearing whatsoever on the alleged crime" is without merit. *Page 896 
The evidence was relevant, and it was properly admitted. No plain error occurred here.
C. Bullets.
Yeomans also argues that the trial court erred in admitting into evidence State's Exhibit 17, "bullets in four envelopes which were not pertaining to the scene." (Appellant's brief at pp. 21-22.) He did not raise this objection at trial, so we review the claim only for plain error. We find none.
State's Exhibit 17, four envelopes containing bullets found at the crime scene on the floor near the victims, were testified to and introduced at trial without objection from Yeomans. (R. 427-29.) Agent Merritt testified that the bullets had been visible in some of the photographs that had been displayed to the jury, and in the crime scene video that had been played for the jury. Thus, the bullets themselves were cumulative of other evidence. The bullets found at the crime scene, which were fired from the murder weapon, were certainly relevant and admissible. No plain error occurred.
D. Crime-scene photographs.
Yeomans argues that State's Exhibits 6A-6Z "had no bearing whatsoever on the alleged crime." He also argues that "most of them," although he does not identify which ones, were gruesome and inflammatory. Yeomans did not object to any of the photographs on relevancy grounds at trial, so that portion of the claim is reviewed only for plain error. He objected at trial to State's Exhibits 6D, 6G, 6H, 6M, 6W, 6X, and 6Y on the grounds that they were grotesque and inflammatory. He did not object at trial on this ground to the other photographs, so that portion of the claim is reviewed only for plain error. We have reviewed the photographs, and we find no error or plain error in their admission into evidence.
The principles regarding the admissibility of crime-scene photographs are well established. In Ex parte Siebert,555 So.2d 780, 783-84 (Ala. 1989), the Alabama Supreme Court stated:
 "Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102
(Ala.Cr.App. 1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184
(Ala.Cr.App. 1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883
(1973); Donahoo v. State, 505 So.2d 1067, 1071
(Ala.Cr.App. 1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876
(Ala.Cr.App. 1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App. 1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App. 1984)."
Yeomans objected to State's Exhibits 6D, 6G, 6H, 6M, 6W, 6X, and 6Y on *Page 897 
grounds that the photographs were unduly prejudicial. With the exception of Exhibit 6G, the photographs depict the murder victims as they appeared when officers arrived at the scene. The photographs were relevant to show the location of the victims's bodies in the house, the cause of their deaths, and the extent of their injuries; the photographs also corroborated testimony offered at trial. Certainly the photographs are gruesome; Yeomans beat his victims about the head and body with a heavy metal pipe, and he then shot them repeatedly, resulting in substantial blood loss and damage, particularly to their heads. That the photographs were gory was directly related to the injuries the victims sustained. The trial court did not err in admitting them for the jury's consideration.
State's Exhibit 6G, to which Yeomans objected at trial on grounds that it was unduly prejudicial, depicted the family dog, which Yeomans shot and killed. As previously discussed in this section of the opinion, crime-scene photographs, if true and accurate, may be admitted in the sound discretion of the trial court. The dog's body was discovered at the scene along with the bodies of the victims and it was photographed. As part of the crime scene, that photograph was admissible. The trial court did not abuse its discretion when it allowed the photograph to be displayed to the jury.
We have reviewed the remainder of the photographs comprising State's Exhibit 6 for plain error and in light of Yeomans's assertion on appeal that the photographs were irrelevant and prejudicial. The trial court did not commit plain error in allowing the jury to view the photographs. The photographs depict various parts of the crime scene, the murder weapons, and the victims and their injuries. Each was relevant to the testimony presented and to the issues before the jury. Although many of them were gruesome, that fact did not render them inadmissible.See, e.g., Hodges v. State, 856 So.2d 875, 916 (Ala.Crim.App. 2001).
No error or plain error occurred, and Yeomans is not entitled to any relief on this portion of his claim.
E. Conclusion.
We have reviewed all of the evidence Yeomans now argues was erroneously admitted at trial. We find no error or plain error in the admission of the crime-scene diagram, the shotgun, the bullets, or the crime-scene photographs. The trial court did not abuse its discretion when it determined that the evidence was relevant. With regard to the photographs, while many of them displayed the fatal wounds sustained by the victims and by the family dog, they were all relevant, corroborated the testimony at trial, and were not admitted solely to inflame the jury. Yeomans is not entitled to relief on any portion of his claim.
 V.
In Issues V and VI of his brief to this Court, Yeomans argues that the jury charge "violated the requirements of the Fifth,Sixth, Eighth and Fourteenth Amendments and the Alabama Law." In Issue V, Yeomans argues that the trial court's charge on reasonable doubt allowed the jurors to convict him on a standard less than that required by constitutional principles (V.A.), and that the instruction interfered with his right to the consideration of lesser-included offenses (V.B.). In Issue VI, Yeomans has merely listed 34 numbered jury instructions that he submitted in writing at trial and that he alleges should have been given. By order of this Court on July 18, 2002, in response to a motion to strike filed by the State, we *Page 898 
granted the State's request that Issue V.B. be struck because the appellate brief contains no citations to the record or to legal authorities in support of the claim. Rule 28, Ala. R.App. P. In the July 18, 2002, order, we granted the State's motion as to Issue VI in part, and stated that the allegations other than those relating to the instruction on reasonable doubt would be reviewed for plain error only. We denied the State's motion as it related to Issue V.A. and the adequacy of the appellate argument on the reasonable-doubt jury instruction.
A. Reasonable-doubt jury instruction.
In Issue V.A., Yeomans argues that the trial court's instruction on reasonable doubt allowed the jury to convict him on a standard less than that required by constitutional principles, citing Cage v. Louisiana, 498 U.S. 39,111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Yeomans did not object to the jury charge at trial, so we will review his claim only for plain error.
The trial court's instruction on reasonable doubt, the presumption of innocence, and the State's burden of proof spans six pages. Yeomans does not identify which portion of the jury charge relating to the reasonable-doubt instructions he finds objectionable. However, because he cites Cage v. Louisiana, and mentions the Cage trial court's erroneous use of the terms "an actual substantial doubt" and "a grave uncertainty," we therefore assume that it was the trial court's definition of reasonable doubt in this case that Yeomans now finds objectionable.
Trial courts are vested with broad discretion when formulating jury charges. When this Court reviews a jury charge, the portions challenged are not considered in isolation but are considered as part of the whole charge. E.g., Duke v. State, 889 So.2d 1, 30
(Ala.Crim.App. 2002). We have reviewed the trial court's instruction on reasonable doubt and find no plain error.
The jury charge included the following instructions on reasonable doubt:
 "The term, `reasonable doubt', means a doubt which has some good reason for [its] arising out of the evidence in the case, such a doubt as you are able to find in the evidence a reason for. It means a reasonable doubt growing out of the unsatisfactory nature of the evidence in the case. It does not mean a doubt which arises from some mere whim, or from any groundless surmise or guess."
(R. 727.)
The court further instructed the jury:
 "So, by `reasonable doubt', it's not meant absolute certainty. There is no such thing as absolute certainty in human affairs, for justice is, after all, but an approximate science and its ends are not to be defeated by a failure of strict and mathematical proof."
(R. 728.)
The court charged the jury that it could not convict Yeomans on mere possibility, surmise, or speculation, however strong they may be. (R. 729.) It again defined a reasonable doubt as one based on the evidence only, or from the lack of evidence. The court also stated in its instruction, "If after reviewing the evidence, the State fails to convince you beyond a reasonable doubt and to a moral certainty that each of the elements exists, you must find the Defendant innocent of the charges." (R. 729-30.)
The charges quoted above, along with the remaining instructions on reasonable doubt, fully explained the legal principles on the concept of reasonable doubt. To the extent Yeomans contends that the jury charge somehow violated Cage v. Louisiana,498 U.S. 39, 111 S.Ct. 328, *Page 899 112 L.Ed.2d 339 (1990), because it uses the term "moral certainty," we note that two of the jury instructions on reasonable doubt included in the court's charge were given at Yeomans's request. (C. 215, 226.) If any error had occurred as a result of the use of the term "moral certainty" it would have been error invited by Yeomans.
However, we find that the use of the term "moral certainty" resulted in no error. This Court has previously examined cases in which the term "moral certainty" was used, and we have found that when the jury charge as a whole correctly conveyed the concept of reasonable doubt, reversal was not due. E.g., Williams v.State, 710 So.2d 1276, 1335 (Ala.Crim.App. 1996). See alsoVictor v. Nebraska, 511 U.S. 1, 16, 114 S.Ct. 1239,127 L.Ed.2d 583 (1994) (use of the term "moral certainty" in context of jury charge as a whole did not suggest a standard of proof lower than the standard required by due process).
Having carefully reviewed the jury instruction on reasonable doubt in the context of the charge as a whole, we find no plain error. The jury was adequately instructed on the concept of reasonable doubt, and Yeomans is entitled to no relief on the claim.
B. Remaining jury charges, Issue VI.
In the heading to Issue VI of his brief, Yeomans states:
 "IT WAS ERROR BY THE COURT TO REFUSE TO GIVE DEFENDANT'S CHARGES 2, 3, 5, 6, 7, 9, 11, 12, 13, 14, 16, 20, 21, 22, 23, 24, 25, 28, 29, 30, 32, 34, 37, AND 38, AND IT WAS CERTAINLY ERROR FOR THE COURT TO REFUSE TO GIVE DEFENDANT'S REQUESTED CHARGES 11, 16, 20, 23, 24, 29, 32, 37 AND 38."
(Appellant's brief at p. 23.)
Yeomans has not provided any argument or citations to the record or to any legal authority in support of this broad claim. As this Court's order of July 18, 2002, states, we review this claim for plain error.
 "`The failure to give a proposed jury instruction constitutes reversible error only if such instruction (1) was correct, (2) was not substantially covered by the court's charge, and (3) concerned a point in the trial which was so important that the failure to give the instruction seriously impaired the defendant's ability to defend himself. United States v. Sans, 731 F.2d 1521, 1529-30 (11th Cir. 1984), cert. denied, 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785
(1985); Connolly [v. State, 602 So.2d 443
(Ala.Cr.App. 1990).]' Dill v. State, 600 So.2d 343, 353-54 (Ala.Crim.App. 1991), aff'd, 600 So.2d 372
(Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993)."
Baker v. State, [Ms. CR-95-0292, Jan. 12, 2001] ___ So.2d ___, ___ (Ala.Crim.App. 2001).
We note, first, that defense counsel at trial withdrew his request that the court give charge number 6 (R. 709), so he cannot now maintain that the court erred in not giving that instruction. We further note that the trial court agreed to give charge number 9 and read the charge to the jury. (C. 209, R. 709, 729.) Yeomans objects to the court's refusal of charges 24 and 25, both of which state that the defendant cannot be convicted based on "mere possibilities, surmises or speculation." (C. 224-25.) Yeomans' requested charge number 10, which is identical to charge numbers 24 and 25, was given by the trial court. (C. 210, R. 729.)
Many of the remaining charges Yeomans now claims should have been given were, in fact, substantially covered in the trial court's very thorough charge to the *Page 900 
jury. For example, the substance of requested charges 2, 16, 20 regarding reasonable doubt was fully covered in the court's charge to the jury. Several of the other requested charges were incorrect statements of the law or were irrelevant. Requested charges 3, 5, 7, and 30 refer to accomplice testimony; Yeomans had no accomplice, so those instructions were properly refused because they would have confused the jury. Finally, several of the requested instructions directed the jury to reach a certain verdict. Requested instruction 21 states, "Ladies and gentlemen of the Jury, you must find the Defendant, James Donald Yeomans, not guilty of Capital Murder." (C. 221.) Requested charges 12, 13, and 14 similarly direct the jury to reach a verdict of not guilty to other charges. Those charges were, of course, correctly refused.
Finally, we note that the jury charge, as a whole, tracks much of the language contained in the pattern jury instructions recommended for use in capital cases. We have held, "`A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error.' Price v. State,725 So.2d 1003, 1058 (Ala.Crim.App. 1997), aff'd, 725 So.2d 1063
(Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809,143 L.Ed.2d 1012 (1999)." Duke v. State, 889 So.2d 1, 31
(Ala.Crim.App. 2002).
Yeomans is entitled to no relief on the claim raised in Issue VI of his brief. The instructions listed by Yeomans were either withdrawn by him at trial, given by the trial court, covered by other instructions, or were correctly refused. No plain error occurred here.
 VI.
In Issue VII of his brief to this Court, Yeomans argues that electrocution, "Alabama's manner of execution," constitutes cruel and unusual punishment and violates the Eighth Amendment to the United States Constitution. This issue is moot. The Alabama Legislature modified § 15-18-82, Ala. Code 1975, to provide for lethal injection as a method of execution. This Court has held that the legislative amendment has rendered moot an appellant's claims that electrocution as a method of execution violates constitutional principles. See, e.g., McGowan v. State, [Ms. CR-95-1775, Dec. 12, 2003] ___ So.2d ___, ___ (Ala.Crim.App. 2003), and cases cited therein.
 VII.
In Issue VIII of his brief to this Court, Yeomans argues that his execution would be unconstitutional because he is mentally retarded; he cites Atkins v. Virginia, 536 U.S. 304,122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), in support of his claim. The State argues that Atkins does not apply because Yeomans is not mentally retarded.
Our review of the record indicates that this claim is being raised for the first time on appeal. Evidence and testimony about Yeomans's level of intellectual functioning was presented at trial, and defense counsel argued that Yeomans's low level of intellectual functioning was a mitigating factor. However, when the prosecutor argued at the sentencing hearing before the trial judge that it was irresponsible for Yeomans to claim that he was mentally retarded after he had spent a lifetime functioning and working in society, defense counsel responded in his closing argument to the court, "With all due respect to [the prosecutor],Mr. Yeomans didn't complain that he was retarded." (R. 832) (emphasis added). Defense counsel's statement accurately reflected the defense strategy and the evidence presented at trial. Defense counsel stated to the jury during his argument at the guilt phase of the trial that the *Page 901 
jury should "think about [Yeomans's] mental capabilities and what all he went through and what he had to endure." (R. 719.) At the penalty phase, defense counsel merely argued that Yeomans "suffers from an extremely low IQ." (R. 776.) Thus, we find that Yeomans's claim that he is mentally retarded and that his execution would be unconstitutional to be a newly raised claim that must be reviewed only for plain error. We find no plain error.
In Atkins v. Virginia, supra, the United States Supreme Court held that execution of mentally retarded defendants violates theEighth Amendment's prohibition against cruel and unusual punishment. 536 U.S. at 321, 122 S.Ct. 2242. The Court did not define a legal standard for mental retardation, but left the definition of the term and the enforcement of the newly announced rule to the states. The Alabama Legislature has yet to enact a statute to address the holding in Atkins. The only Alabama statute that provides assistance in making this determination is § 15-24-2(3), Ala. Code 1975, which defines a "mentally retarded person" as "[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments."
The Alabama Supreme Court in Ex parte Perkins, 851 So.2d 453
(Ala. 2002), in determining whether the appellant was mentally retarded and therefore not subject to execution, applied the broadest definition of mental retardation recognized in those states that prohibit the execution of the mentally retarded. The Court stated:
 "Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."
851 So.2d at 456. In its evaluation of the evidence presented at trial, the Court noted that Perkins had a full scale IQ of 76 and that he had completed college level courses while in prison and that he had maintained jobs and interpersonal relationships during his adult life. Id. In light of the standards that currently exist in Alabama regarding the evaluation of Yeomans's claim, we find that the record does not establish that Yeomans is mentally retarded.
In its sentencing order, the trial court summarized the evidence regarding Yeomans' intellectual status and determined that he is not mentally retarded. The court stated:
 "The Court further finds that the Defendant had his first psychological or mental evaluation when he was seven years old. At this time he was administered the Stanford Binet Intelligence test which resulted in his achieving an I.Q. score of 67. This I.Q. score falls within the middle range of mental deficiency. At age nine, he was evaluated again. On administration of the Wechsler Intelligence [Scale] for Children Revised, he achieved a full scale I.Q. score of 83 which falls within the low average range of intelligence. His final evaluation occurred at age seventeen. At this time the administration of the Wechsler Adult Intelligence Scale resulted in a full scale I.Q. score of 72 which falls near the lower limit of the borderline range of intelligence. Mr. Yeomans has been employed most of his adult life. *Page 902 
He has been married three times and has been head of his family. Even though the Defendant had a tumultuous upbringing and was currently functioning in the low average range of intelligence, he has and does function `normally' in society. He is not mentally ill and he is not mentally retarded."
(C. 269.)
We agree with the trial court's analysis of the evidence. We make these additional comments based on our review of the evidence. The Stanford-Binet Intelligence test was also administered to Yeomans when he was 11 years old, and he achieved a score of 78. This score placed him in the upper borderline range of intellectual functioning. (C. 194.) Dr. D'Errico, a psychologist and certified forensic examiner who conducted the court-ordered forensic evaluation of Yeomans, testified that he had reviewed Yeomans's school records, including three psychological reports of intellectual assessments. He had also interviewed Yeomans. Dr. D'Errico determined that Yeomans was not mentally retarded, but was functioning in the borderline range of intelligence.[11] The evidence indicates that Yeomans's level of general intellectual functioning is not significantly subaverage.
Furthermore, we agree with the trial court that Yeomans did not manifest significant deficits in his adaptive behavior. The commonly used definition of mental retardation requires that these deficits be manifested before the age of 18 years. Exparte Perkins, 851 So.2d at 456. Yeomans was placed in special-education classes throughout much of his academic career. Yeomans's second grade report card does not indicate that he was in special-education classes, and he made A's and B's during the year. (C. 196.) The Individualized Education Program form completed while Yeomans was in the eleventh grade indicates that Yeomans was assigned to shop class and to a driver's education class. (C. 159.) Yeomans's younger sister testified that Yeomans had a low I.Q. and that he could not read or write. None of the evidence establishes that Yeomans suffered significant deficits in his adaptive behavior before the age of 18 years.
Moreover, the testimony at trial indicated that, in adulthood, Yeomans did not suffer significant deficits in his adaptive behavior. To the contrary, he was steadily employed, he married more than once, fathered and raised several children and, according to defense testimony, he tried to teach his children right from wrong.
Considering all of the evidence in the record before us and applying the broad definition of mental retardation set forth by the Alabama Supreme Court in Ex parte Perkins, supra, we are convinced that Yeomans is not mentally retarded. Therefore,Atkins v. Virginia, supra, does not preclude imposition of the death sentence in this case. See also, Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala. 2003); Adams v.State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___ (Ala.Crim.App. 2003). Yeomans is not entitled to any relief on this claim.
 VIII.
In Issue IX of his brief to this Court, Yeomans argues that §§13A-5-46 and *Page 903 13A-5-47, Ala. Code 1975, violate Ring v. Arizona, 536 U.S. 584,122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because those portions of Alabama's death-penalty statute permit the judge to determine whether the aggravating circumstances outweigh the mitigating circumstances and whether the death sentence should be imposed. He argues, "In order for a defendant to be put to death based on aggravating circumstances other than his prior criminal history, it should be put to the jury and tried by the jury, beyond a reasonable doubt, as guaranteed by the Sixth Amendment." (Appellant's brief at p. 32.) This claim was not raised at trial, so we review it for plain error. We conclude that no plain error exists.
To the extent Yeomans argues that the jury is required to conduct the final weighing of the aggravating circumstances and the mitigating circumstances, that argument has been decided adversely to him. In Ex parte Waldrop, 859 So.2d 1181, 1190
(Ala. 2002), the Alabama Supreme Court addressed this claim and stated, "Thus, the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently,Ring and Apprendi [v. New Jersey, 530 U.S. 466,120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),] do not require that a jury weigh the aggravating circumstances and the mitigating circumstances." Yeomans's claim to the contrary must fail.
To the extent Yeomans contends that Ring holds that only the jury can determine the existence of any aggravating circumstances, he misinterprets Ring. In Ring, the United States Supreme Court held, "Capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."536 U.S. at 589, 122 S.Ct. 2428. The jury in this case convicted Yeomans of robbery-murder and of the murder of two or more persons pursuant to one scheme or course of conduct. By its verdict, the jury found the existence of two aggravating circumstances, §13A-5-49(4) and (9), Ala. Code 1975, rendering Yeomans eligible for the death penalty. Alabama courts have consistently held thatRing is not violated in circumstances such as those presented here. For example, in McGowan v. State, [Ms. CR-95-1775, Dec. 12, 2003] ___ So.2d ___, ___ (Ala.Crim.App. 2003), we stated:
 "Because the jury convicted McGowan of one count of murder during a first-degree robbery, a violation of § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, § 13A-5-49(4) was `proven beyond a reasonable doubt.' §§ 13A-5-45(e); -5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. § 13A-5-45(f). Thus, the jury, and not the trial court, determined the existence of the `aggravating circumstance necessary for imposition of the death penalty,' as required by Ring, 536 U.S. at 609, 122 S.Ct. 2428."
See also Ex parte Waldrop, 859 So.2d 1181, 1188 (Ala. 2002).
Because there is no legal support for Yeomans's claims regarding the constitutionality of these provisions of Alabama's death-penalty statute, no plain error exists and Yeomans is not entitled to any relief on these claims.
 IX.
Although the sentencing order is thorough, and although Yeomans did not make any allegations of error regarding the trial court's sentencing order, our review of the order, conducted as part of our plain-error review, convinces us that the cause must *Page 904 
be remanded for compliance with § 13A-5-47, Ala. Code 1975. Section 13A-5-47(d) provides, in relevant part, that the sentencing court "shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52." The trial court found two aggravating circumstances to exist, that the capital offense was committed during a robbery, and that Yeomans intentionally caused the death of two or more people. §13A-5-49 (4) and (9), Ala. Code 1975. The court did not specifically address the remaining statutory aggravating circumstances, but it appears that the court referred only to those circumstances it considered and found to exist, and that it found the other circumstances not to exist. The trial court made findings as to each of the statutory mitigating circumstances, as directed by the statute.
The trial court's findings regarding the nonstatutory mitigation require clarification. The trial court stated:
 "The Court finds this is a textbook Domestic Violence Case. The fact that these deaths were caused by a Domestic Violence perpetrator during a Domestic Violence episode and with the accompanying rage is not such a mitigating factor as to outweigh the aggravating circumstance of killing three people by one act or pursuant to one scheme or course of conduct."
(C. 268) (emphasis added).
The trial court next discussed the scores Yeomans received on the various intelligence tests and noted that Yeomans had a tumultuous upbringing. The court then stated, "The Court finds that his low average range of intelligence and the abuse he received in childhood are not such mitigating factors as tooutweigh the aggravating factors of killing three people by an act or pursuant to one scheme or course of [conduct]." (C. 269) (emphasis added).
The order is unclear as to whether the court found as nonstatutory mitigating factors that these deaths occurred during a domestic-violence episode, that Yeomans was abused, and that his intelligence was low average and that these factors did not outweigh the aggravating factors, or whether the court found that they were not mitigating factors at all. Furthermore, if the court found the circumstances to exist, it appears that the court weighed each factor individually against a single aggravating factor, the killing of two or more people by one act or pursuant to one scheme or course of conduct. Alabama's statute, however, requires that the trial court "determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist." § 13A-5-47(e), Ala. Code 1975. To the extent the trial court found a mitigating circumstance to exist and then weighed it against a single aggravating circumstance to exist, this procedure would not have been in compliance with the statute.
Therefore, based on the requirements of § 13A-5-47(d), Ala. Code 1975, we remand this cause to the trial court for it to amend its sentencing order. The amended sentencing order shall include specific findings regarding the existence or nonexistence of each statutory aggravating circumstance in § 13A-5-49 and each statutory mitigating circumstance in § 13A-5-51. The trial court's sentencing order shall also clearly state which, if any, nonstatutory mitigating circumstances, defined in § 13A-5-52, that the trial court found to exist. If necessary, the court may reweigh the aggravating circumstances and the mitigating circumstances and resentence Yeomans. See, e.g., Ziegler v.State, 886 So.2d 127, *Page 905 
149 (Ala.Crim.App. 2003), aff'd on return to remand,866 So.2d at 150. Key v. State, 891 So.2d 353, 363 (Ala.Crim.App. 2002);McNabb v. State, 887 So.2d 929, 989 (Ala.Crim.App. 2001).
We further note that during the sentencing hearing before the jury, the trial court stated that it did not intend to charge the jury on the § 13A-5-49(8), Ala. Code 1975, aggravating circumstance, that the crime was especially heinous, atrocious, or cruel when compared to other capital offenses. The trial judge's comments suggested that he believed that, in order to prove that aggravating circumstance, expert testimony was required to provide a comparison between this case and other capital offenses. (R. 778.) Alabama's appellate courts have specifically stated that no comparison data from other capital offenses must be presented to prove that aggravating circumstance. The Alabama Supreme Court stated:
 "Although a very narrow and literal reading of the statute [§ 13A-5-49(8)] may suggest that such a comparison is required, it would be virtually impossible for the court to implement. Charging the jury on pertinent facts of `other capital cases' would unduly burden the court. It would be unworkable for the court and would thoroughly confuse the jury."
Ex parte Bankhead, 585 So.2d 112, 125 (Ala. 1991), aff'd onreturn to remand, 625 So.2d 1141 (Ala.Crim.App. 1992), rev'd onother grounds, 625 So.2d 1146 (Ala. 1993).
"When considering whether a particular capital offense was `especially heinous, atrocious or cruel,' this Court adheres to the standard set out in Ex parte Kyzer, 399 So.2d 330, 334
(Ala. 1981), namely, that the particular offense must be one of those `conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'" Duke v. State,889 So.2d at 36. The facts of this case supported the presentation of a jury charge on the § 13A-5-49(8) aggravating circumstance. The facts of the case, which are fully set forth at the beginning of this opinion, demonstrate that each of the three victims was struck repeatedly on the head and the body with a heavy metal pipe, and that the victims were left moaning on the floor for some period of time until Yeomans fired bullets into their heads. All of this violence occurred while the children were watching or were nearby in another room. The evidence could permit the inference that the victims might have been aware that the children (or grandchildren) were witnesses to Yeomans's violence and could have feared that the children would suffer the same fate. Clearly, the facts of this case were sufficient to warrant consideration by the jury and the trial judge of the §13A-5-49(8) aggravating circumstance, because the crime could have been considered to be conscienceless or pitiless and unnecessarily torturous to the victims.
That the jury was not charged on this aggravating circumstance was at most harmless error and does not require reversal. Yeomans was not prejudiced as a result of the trial court's failure to charge the jury on this aggravating circumstance because the jury charge would have made an additional aggravating circumstance available for the jury's consideration, which the jury otherwise did not have before it. Yeomans suffered no prejudice as a result of this error.
Because we are remanding this cause for the trial court to clarify its sentencing order, however, we further direct the trial court to consider this aggravating circumstance when it corrects its sentencing order, and to make specific fact findings in the sentencing order if it determines that *Page 906 
this aggravating circumstance exists.[12] The court is free to reweigh the aggravating and the mitigating circumstances on remand. Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App. 2001).
 Conclusion
We remand this cause for two reasons. First, the trial court must strike two of Yeomans's convictions and sentences for the murder of two or more persons pursuant to one scheme or course of conduct. One conviction and sentence for the murder of two or more persons pursuant to one scheme or course of conduct shall remain, along with the conviction and sentence for robbery-murder. Second, for the reasons discussed above, the trial court shall submit an amended sentencing order in compliance with § 13A-5-47 to this Court within 49 days of the date of this opinion. We pretermit our complete plain-error review of this case pending the trial court's return to remand.
REMANDED WITH DIRECTIONS.*
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.
[2] Yeomans was sentenced on July 18, 2001. The defense motions were filed on August 17, 2001. The record indicates that a hearing on the motions was scheduled for September 26, 2001, but there is no indication in the record that a hearing was held, and the record contains no transcript of a posttrial hearing. The trial court entered an order on October 26, 2001, denying the motion for a new trial and on October 30, 2001, entered an order denying the motion for a judgment of acquittal. From the record before us, it appears that both motions were denied by operation of law before the trial court entered its orders because the motions remained pending for more than 60 days after pronouncement of the sentence and there is no indication on the record of the express agreement of the parties to extend the time for a ruling. Rule 24.4, Ala. R.Crim. P.
[3] For clarity, Julie Yeomans will be referred to as "Julie," and the appellant will be referred to as "Yeomans."
[4] The witness's name appears to be misspelled in the trial transcript. In this opinion we will use the spelling that appears on the psychological evaluation presented to the court on Dr. D'Errico's letterhead. (C. 60-65.)
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[6] On July 3, 2002, Yeomans filed with this Court an "amended and substituted brief."
[7] Yeomans also claims that the State failed to establish a proper chain of custody for the stolen purse. Because Yeomans more fully addresses this argument in Issue II of his brief on appeal, we will defer discussion of this allegation of error in this portion of the opinion and will address the claim in Part III of this opinion. brief on appeal, we will defer discussion of this allegation of error in this portion of the opinion and will address the claim in Part III of this opinion.
[8] In Part I of this opinion, we held that two of the three convictions for murder of two or more people violated double-jeopardy principles and we remanded the cause for the trial court to vacate two of the convictions. Thus, the issue before us now becomes whether the remaining two counts of capital murder were properly tried together.
[9] Yeomans uses the terms "consolidation" and "joinder" interchangeably.
[10] The record indicates that the shotgun was on a chair in the den, near the front door of the house.
[11] The Attorney General and Yeomans refer in their briefs to this Court to the psychological evaluation performed by Dr. Doug McKeown, the clinical and forensic psychologist retained by the defense to perform an independent evaluation. While Dr. McKeown's report was filed with the trial court, Dr. McKeown did not testify at trial and the findings were not otherwise presented to the jury. Because Dr. McKeown's report was not evidence in the case, we will not consider it here.
[12] Alabama law requires a trial court to enter specific fact findings if it determines that this aggravating circumstance exists. See, e.g., McGowan v. State, [Ms. CR-95-1775, Dec. 12, 2003] ___ So.2d ___, ___ (Ala.Crim.App. 2003) (trial court instructed on remand "to comply with Ex parte Kyzer,399 So.2d 330 (Ala. 1981), by making specific findings of fact as to why it believes that the aggravating circumstance of § 13A-5-49(8) exists").
* Note from the reporter of decisions: On June 25, 2004, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On October 15, 2004, that court denied rehearing, without opinion.